UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

            :

ANDREIA CORREIA,              :

            :

           Plaintiff,    :

            :

       v.           :     14 Civ. 7690 (KPF)

            :

UNUM LIFE INSURANCE COMPANY OF  :     <u>OPINION AND ORDER</u>

AMERICA, TIME WARNER, INC., and  :

TIME WARNER, INC. LONG-TERM    :

DISABILITY PLAN,           :

            :

         Defendants. :

            :

------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: <u>September 29, 2016</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Andreia Correia alleges that Defendants Unum Life Insurance

Company of America ("Unum"), Time Warner, Inc. ("Time Warner"), and the

Time Warner, Inc. Long-Term Disability Plan (the "Plan," and collectively,

"Defendants")[1] improperly denied her claim for long-term disability benefits, in

violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. §§ 1001-1191c, 1202-1242, 1301-1461.  Plaintiff applied for, and now

seeks to recover, benefits for a cognitive dysfunction rooted in an organic or

physical etiology (i.e., a cause not attributable to mental illness).  Defendant

---

[1]     Plaintiff originally named the Time Warner, Inc. Short-Term Disability Program as a
fourth defendant, but the parties advised the Court in September 2015 that they had
settled Plaintiff's short-term disability claims, and the Court subsequently endorsed a
stipulation of dismissal to that effect.  (Dkt. #105).  The Clerk of Court is directed to
amend the caption accordingly.

Unum, administrator of the Plan, denied Plaintiff's request for benefits, and affirmed the denial of benefits upon appeal.

Plaintiff filed suit on March 12, 2014, and both parties consented to a bench trial on the papers under Rule 52 of the Federal Rules of Civil Procedure. This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1). As set forth in the remainder of this Opinion, the Court finds that Unum's denial of Plaintiff's long-term disability benefits claim was not arbitrary and capricious, and, further, that Plaintiff did not meet her burden to show that she was entitled to such benefits. It will therefore enter judgment in favor of Defendants.

## A.    The Court's Findings of Fact[2]

### 1.    Overview

From 2001 until her departure on disability leave in May 2012, Plaintiff worked for Time Warner, through which she received short- and long-term disability coverage. When she left Time Warner, Plaintiff worked as a Senior Programmer Analyst, a role in which she "assist[ed] in the planning, design and development of application requirements," and which required that she "[w]ork[] at the highest level of all technical phases of programming." (LTD Cl. 809). Plaintiff was required, *inter alia*, to "[p]articipate[] in feasibility

---

[2]     The facts herein are drawn from the records of Plaintiff's Short-Term Disability Claim ("STD Cl. [page]"), her Long-Term Disability Claim ("LTD Cl. [page]"), Unum's Long-Term Disability Plan ("LTD Plan [page]"), and certain of the additional exhibits filed by Plaintiff in support of her motion ("Pl. Ex."). For convenience, Plaintiff's opening trial brief is referred to as "Pl. Br." (Dkt. #110); Defendants' opening and opposition brief as "Def. Br." (Dkt. #114); Plaintiff's opposition and reply as "Pl. Reply" (Dkt. #115); and Defendants' reply as "Def. Reply" (Dkt. #118), with citations corresponding to the documents' ECF pagination.

studies, analyze[] business requirements, interfac[e] with users to identify and develop system requirements taking into account desired results, hardware limitations[,] and operating requirements," in addition to having duties of "[p]repar[ing] detailed documentation, provid[ing] user training and support as required, ensur[ing] procedures are thoroughly tested before release, and monitor[ing] test results." (*Id.*).  On May 18, 2012, Plaintiff ceased working in her prior position (*id.* at 11); thereafter, she sought short- and long-term disability benefits based on a claim of a qualifying cognitive dysfunction, as detailed below.

### 2.   Plaintiff's Claim for Long-Term Disability Benefits

#### a.   Time Warner's Long-Term Disability Plan

The Plan, administered on behalf of Time Warner by Unum, advises beneficiaries, in relevant part:  "You are disabled when Unum determines that: [i] you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and [ii] you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury," with the bolded terms defined by the Plan.  (LTD Plan 18 (boldface in original)).  As relevant here, (i) "limited" is defined as "what you cannot or are unable to do"; (ii) "material and substantial duties" are defined as duties that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified"; (iii) "regular occupation" is defined as "the occupation you are routinely performing when your disability begins"; and (iv) "sickness" is defined as "an illness or disease." (*Id.* at 35-37).  Further,

the Plan imposes a 26-week "elimination period," defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum."  (*Id.* at 6, 18, 35).

In the "Claim Information" portion of the Plan, the section titled "What information is needed as proof of your claim?" specifies certain information that must be substantiated in a proof of claim, including: (i) that the claimant is "under the **regular care** of a **physician**"; (ii) documentation of the claimant's monthly earnings; (iii) the date the alleged disability began; (iv) the cause of the cited disability; (v) the extent of disability, including restrictions and limitations precluding the claimant's regular occupation; and (vi) contact information for the claimant's treating hospitals and physicians.  (LTD Plan 8 (boldface in original)).

Of note, the Plan also provides that "[d]isabilities, due to sickness or injury, which are primarily based on **self-reported symptoms**, and disabilities due to **mental illness** have a limited pay period of up to 24 months."  (LTD Plan 26 (boldface in original)).  Following that 24-month period, Unum will continue to pay benefits *only* if the claimant is confined to a hospital or institution or if, after the 24-month period, the claimant continues to be disabled and "subsequently become[s] confined to a hospital or institution for at least 14 days in a row."  (*Id.*).  Unum defines "self-reported symptoms" as those for which "the manifestation[s] of [the claimant's] condition" reported to a physician "are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine."  (*Id.* at 37).  The Plan gives a

4

number of examples, including "headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy." (*Id.*). "Mental illness," in turn, is defined as "a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions." (*Id.* at 36). The Plan further notes that such conditions "are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment." (*Id.*).

### b.   Plaintiff's Medical and Psychological Treatment

### i.   Evaluations and Treatment in 2009

Plaintiff first visited a doctor for issues related to the instant disability claim on October 7, 2009, when she visited neurologist Slobodan Miric. (LTD Cl. 341). According to Dr. Miric, Plaintiff was "complaining that she ha[d] had memory problems for more than five years," and felt "that she [was] becoming more forgetful, that she [could not] memorize certain things, that she [was] having difficulty learning, and that these things [were] getting worse over the last five years." (*Id.*). Plaintiff reported feeling embarrassed at work due to these difficulties; she also referenced taking Klonopin and Vyvanse, but did not believe those medications were helping. (*Id.*).[3]

---

[3]   Klonopin is "a sedative generally used to treat seizures, panic disorder, and anxiety." *Villa* v. *Colvin*, No. 14 Civ. 463 (MAT), 2016 WL 1054757, at *2 (W.D.N.Y. Mar. 17, 2016). Vyvanse is "a central nervous system stimulant which is indicated for the treatment of ADHD [Attention Deficit Hyperactivity Disorder]." *Doe* v. *Unum Life Ins. Co. of Am.*, 116 F. Supp. 3d 221, 224 (S.D.N.Y. 2015).

Dr. Miric recorded Plaintiff's mental status as "normal comprehension, attention, and judgment," and noted that she denied headaches or visual changes.  (LTD Cl. 342).  He also indicated that he would refer Plaintiff for an MRI of the brain and cervical spine, in addition to an EEG and a neuropsychological evaluation "for memory testing and ADD [Attention Deficit Disorder]."  (*Id.* at 343).  Dr. Miric further noted that he would obtain Plaintiff's prior laboratory studies.  (*Id.*).  In a follow-up visit on October 20, 2009, Dr. Miric reported, in relevant part, that Plaintiff's brain MRI results were within normal limits, but her EEG results were still pending and she had not yet completed memory testing with the neuropsychologist.  (*Id.* at 346; *see also id.* at 366-67 (Plaintiff's brain MRI results)).

Between October and December 2009, Plaintiff underwent neuropsychological testing with Dr. Stephen Craig, a clinical psychologist, pursuant to Dr. Miric's referral.  (LTD Cl. 85-93).  Dr. Craig stated that Plaintiff had been referred due to "gradual, unexplained memory and information processing problems," and that Plaintiff had reported experiencing "an onset of difficulties approximately 3 to 4 years [prior] with gradual progression and the recognition that the progression [was then] accelerating."  (*Id.* at 85).  Plaintiff informed Dr. Craig that she had sought help for these issues for the previous two-and-a-half to three years from her primary care physician.  (*Id.*).

Dr. Craig noted that Plaintiff's reported cognitive problems included "memory blocking," including an inability to recall information on a short-term basis (i.e., minutes or days earlier), in addition to "having great difficulty with

6

new learning and retention." (LTD Cl. 85).  Plaintiff informed Dr. Craig that her coworkers had begun to notice her difficulties and declining performance, and "it was getting so that she could no longer perform her job duties." (*Id.* at 85-86).  Apart from cognitive and memory-related issues, Plaintiff also reported muscle and joint pain, tightness, and cramps. (*Id.* at 85).

In the course of Plaintiff's visits, Dr. Craig administered three tests, including (i) the Wechsler Adult Intelligence Scale – 3rd Edition ("WAIS-III");[4] (ii) the Developmental Test of Visual Motor Integration – 5th Edition ("VMI");[5] and (iii) the Test of Memory and Learning – 2nd Edition ("TOMAL II").[6] (LTD Cl. 85).  Dr. Craig documented that Plaintiff was "cooperative in all aspects of assessment" and "appeared motivated on all tasks." (*Id.* at 86).  From the WAIS-III, Dr. Craig concluded, importantly, that Plaintiff's score on the working memory portion was "at the lower limit of the Low Average range, upper limit of the Borderline range[,] and significantly below her scores on all other Index and IQ Domains." (*Id.* at 88).  Further, Dr. Craig observed that "[a]mong the verbal tests, [Plaintiff's] score on both Vocabulary and Information exceeded her average score for the set of verbal tests by a significant degree while her scores

---

[4]     According to Dr. Craig's records, the WAIS-III provided standard measures of intelligence quotient ("IQ") in the areas of verbal IQ, performance IQ, and full-scale IQ; it also provided scores for "Verbal Comprehension, Perceptual Organization, and Working Memory and Processing Speed." (LTD Cl. 87).

[5]     Dr. Craig indicated that the VMI test "identifies problems with visual perception, motor coordination, and visual-motor integration," and may be used to diagnose cognitive development issues. (LTD Cl. 91-92).

[6]     Dr. Craig described the TOMAL II as "a memory battery used for evaluating general and specific memory function," consisting of "8 core subtests, 6 supplementary subtests, and 2 delayed recall tasks." (LTD Cl. 90).

on both Arithmetic and Digit Span were significantly below average." (*Id.* at 89). As Dr. Craig's report emphasizes, "[b]oth Vocabulary and Information draw on well learned data and performance does not rely on either the learning of new information or manipulation of information," suggesting Plaintiff's relative strength in the realm of long-term information retention. (*Id.* (emphasis in original)).

From the TOMAL-II test, Dr. Craig gleaned that Plaintiff had "deficits in [her] ability to hold and manipulate stimuli in short term/working memory [that were] consistent with her reported day to day problems as well as what was seen on all aspects of assessment." (LTD Cl. 91). Dr. Craig further noted that deficits on non-verbal tests stood "in stark contrast to [Plaintiff's] earlier level of functioning." (*Id.*). Finally, for the VMI test, Dr. Craig recorded Plaintiff's score in the 70th percentile for visual motor integration and the 10th percentile for visual perception. (*Id.* at 91-92).

Overall, Dr. Craig observed that the cognitive testing reflected Plaintiff's "better ability to recall 'long term' information," as contrasted with her "deficits across most areas of verbal and non-verbal recall and manipulation of stimuli in short-term/working memory." (LTD Cl. 93). Dr. Craig concluded that his "findings clearly document[ed] deficits that [were] consistent with the narrative summary that [Plaintiff] provide[d] as to her day-to-day difficulties"; significantly, however, his findings did not "pin-point an etiology of those difficulties." (*Id.*). Instead, Dr. Craig offered that his findings "serve as a baseline assessment of current functioning — one that is able to document

deterioration from prior levels of functioning — and as a reference point for comparison of change over time — either improvement or decline — as treatments and interventions proceed." (*Id.*).

On November 17, 2009, Plaintiff returned to Dr. Miric, who reported that her EEG was "normal," and that his neurological examination had indicated that Plaintiff had "normal comprehension." (LTD Cl. 349). Dr. Miric noted that Plaintiff was in the process of finishing the neuropsychological exam, and he recorded Plaintiff's statements to him concerning her prior prescriptions for the stimulant Adderall and the anti-anxiety drug Xanax. (*Id.*). Dr. Miric also relayed that Plaintiff had "described … an episode while she was doing [the] neuropsychological evaluation [during which] she had sudden symptoms of headaches and tension in the whole body while she was trying to perform calculation which lasted several hours." (*Id.*). Plaintiff told Dr. Miric this was "very unusual." (*Id.*).

### ii.    Evaluations and Treatment in 2010

The notes of Plaintiff's January 6, 2010 visit to Dr. Miric referenced her 2009 evaluation by Dr. Craig, who, as noted earlier, had "concluded that [Plaintiff] had deficit[s] related to retention, manipulation of new information and short term working memory." (LTD Cl. 351). Dr. Miric noted Dr. Craig's conclusion that these "[c]urrent findings [could] serve as a baseline for further comparison." (*Id.*). He also noted that Plaintiff "continue[d] to have problems with memory and finding the words," and she reported severe daily headaches. (*Id.*).

9

Dr. Miric found that Plaintiff's laboratory studies were normal.  (LTD Cl. 351).  Ultimately, he concluded that Plaintiff "seem[ed] to have genuine cognitive decline of unexplained etiology," and while her brain MRI and laboratory studies had come back normal, he thought Plaintiff should be subjected to further testing "due to [the] neuropsychological evaluation that she recently completed."  (*Id.* at 352).  Dr. Miric wanted to rule out vasculitis, and he prescribed a 72-hour ambulatory EEG and further follow-up with a neuropsychologist.  (*Id.*).

Following the ambulatory EEG, Plaintiff again met with Dr. Miric on February 19, 2010.  (LTD Cl. 354).  Dr. Miric noted that on the third day of the EEG, there were "paroxysmal events which could represent electrographic generalized seizure discharges without subjective symptoms."  (*Id.*).  Plaintiff described "episodes when she suddenly [was] feeling frozen with her mind," and Dr. Miric noted a "possibility that [Plaintiff] could have reflexive seizures." (*Id.* at 354-55).[7]

### iii.     Evaluations and Treatment in 2012

The record reveals no relevant medical treatment of Plaintiff between February 2010 and March 2012.  On March 26, 2012, Plaintiff visited Doctor of Osteopathic Medicine Bruce Lee Mintz for a health maintenance visit; Dr. Mintz noted her complaints of headaches, anxiety, and memory loss.  (LTD Cl. 128-

---

[7]      Though Plaintiff made reference to "seizures" in consulting with other treating medical professionals, the record reveals no further substantiation of this diagnosis.  An EEG administered in May 2013, moreover, revealed "no definite epileptiform activity."  (LTD Cl. 952).

31).  On April 2, 2012, Plaintiff followed up with Dr. Mintz about her headaches, and informed him that she had ceased taking her prescribed medication.  (*Id.* at 126-27).  Subsequently, during a May 17, 2012 visit to Dr. Mintz, Plaintiff complained primarily of chest pain; while Dr. Mintz's notes contain references to memory loss and anxiety, those issues did not appear to be the foci of Plaintiff's visit.  (*Id.* at 123-25).

In May 2012, Plaintiff returned to Dr. Craig for re-evaluation.  Dr. Craig indicated that Plaintiff reported resolution of her severe headaches, though she claimed that her memory was still impaired.  (LTD Cl. 94).  Plaintiff also informed Dr. Craig about resultant performance-related issues at work, noting that "she ha[d] been told that unless things improve[d] she [would] likely be let go."  (*Id.*).  On the WAIS-IV and TOMAL-II tests, Dr. Craig reported improvements in certain sectors and regression in others, and an overall deterioration on the VMI test.  (*Id.* at 94-98).  Dr. Craig noted that "[g]iven the pattern of improvement in some areas … juxtaposed to deterioration in some aspects of verbal cognitive functioning and verbal memory it is important to continue to monitor [Plaintiff]."  (*Id.* at 98).  He recommended re-evaluation after one year.  (*Id.*).

Also in May 2012, Plaintiff visited neurologist Walter Husar, who noted that Plaintiff reported "a long history of headaches and [that she] ha[d] been seen by many different physicians."  (LTD Cl. 83).  Dr. Husar wrote that Plaintiff's headaches, pains, and chemical sensitivity "began many years ago"; that she had previously treated with a neurologist who "[g]ave up on her"; but

11

that she had more recently "gotten an ultimatum [at work] either to get help or get terminated." (*Id.*).[8]  Dr. Husar referenced Plaintiff's "extensive evaluation, [with an] essentially normal work-up," including "extensive laboratory testing that essentially demonstrate[d] a normal central nervous system problem." (*Id.*).  Dr. Husar noted, however, that "neuropsychological testing ha[d] demonstrate[d] her cognitive issues quite well, but fail[ed] to achieve an actual diagnosis or therapy." (*Id.*).  Dr. Husar stated that Plaintiff's "neurological review of systems [was] unremarkable and non-contributory," and his impression was "Memory Loss – Neuropsychological evidence of cognitive dysfunction," and pain and myalgia due to Epstein-Barr Virus.  (*Id.* at 83-84). Dr. Husar's "plan" included reassurance, short-to-long-term disability, and follow-up in one month.  (*Id.*).

On May 25, 2012, Dr. Husar filled out an Attending Physician Statement, indicating that he had diagnosed Plaintiff with cognitive dysfunction (albeit with no listed etiology), and noting that her memory, calculation, and verbal processing had all declined.  (LTD Cl. 248).  Dr. Husar based his diagnosis on an examination and neuropsychological testing, and he described a treatment plan of cognitive rehabilitation.  (*Id.* at 248-49).  His Attending Physician Statement described Plaintiff's functional capacity in terms of her ability to

---

[8]    Plaintiff relayed to Unum's field investigator in April 2013 that her supervisor had inquired in early 2012 about her health, and that Plaintiff had "admitted … that she was ill." (LTD Cl. 792).  Plaintiff stated that the supervisor referred her to Human Resources, who then "told her that she had no choice but to go on short-term disability."  (*Id.*).  After reviewing the record in Plaintiff's short- and long-term claims, the Court has not identified any documentation of this sequence of events.

engage in a number of physical tasks, but noted that her restrictions and limitations included "[a]ny cognitive processing tasks." (*Id.* at 249-50). Dr. Husar indicated that he did not know when Plaintiff would improve, but estimated that it would take "at least 6-10 months." (*Id.* at 250).

In June 2012, Plaintiff visited Dr. Husar for a follow-up consultation, but his findings and notes were largely identical; his plan included follow-up in four more months. (LTD Cl. 81-82). In August 2012, Plaintiff returned to Dr. Husar, who noted that "[r]epeat neuropsychological testing show[ed] improvement in certain domains and worsening in others," and while certain of Plaintiff's pains were better, her headaches were worse. (*Id.* at 102). Dr. Husar's impressions included (i) "Memory Loss – the Sequelae of [Epstein-Barr Virus] infection with Neuropsychological evidence of cognitive dysfunction with minimal evidence on bedside testing"; and (ii) "Fibromyalgia with myalgias, pain, and headaches – secondary to Epstein-Barr viral infection." (*Id.* at 103). Dr. Husar prescribed, *inter alia*, cognitive rehabilitation with repeat testing after six months. (*Id.*).

In July 2012, while on short-term disability leave, Plaintiff was referred by Time Warner's Human Resources Department's Employee Assistance Program to clinical psychologist Edward Linehan. (LTD Cl. 609). Dr. Linehan referenced an earlier diagnosis of Chronic Fatigue Syndrome ("CFS"), and listed Plaintiff's then-current symptoms to include chronic pain, muscle and joint pain, sleep disturbance, dizziness, cognitive deficits, and speech impairment. (*Id.*). Dr. Linehan recorded that Plaintiff had a boyfriend in Florida whom she

saw once a month and described as "useless," and she had family local to
Arizona who similarly did not provide support.  (*Id.* at 609-10).  Dr. Linehan
ultimately diagnosed Plaintiff with depression and with reduced cognitive
functioning due to CFS, and noted a Global Assessment Functioning ("GAF")
score of 40.  (*Id.* at 610-11).[9]

In the early fall of 2012, Plaintiff visited Dr. Martha Grout at the Arizona
Center for Advanced Medicine for issues of chronic fatigue and pain.  (LTD
Cl. 110).  Dr. Grout's plan was "to test functional nutrition status," as she
suspected nutritional deficiencies and issues may have been contributing to
Plaintiff's complaints.  (*Id.*).  Dr. Grout recommended that Unum continue
Plaintiff's short-term disability, and "anticipate[d] [ ] a 6-9 month course of
rehabilitation," after which Plaintiff could return to work.  (*Id.*).

On October 23, 2012, Plaintiff met with Dr. Kathleen Cramer, a licensed
psychologist, for a diagnostic interview.  (LTD Cl. 108).  Plaintiff informed Dr.
Cramer that she "was forced to quit her job due to memory, concentration, and
attention problems at work."  (*Id.*).  Of note, Dr. Cramer did not perform any
testing, but theorized based on Plaintiff's reports of headaches, sleep issues,
and seizures that while those medical issues might not "in isolation impact
cognitive functioning, it [was] possible that, cumulatively, they [could] impact

---

[9]     "The GAF is a scale promulgated by the American Psychiatric Association to assist in
tracking the clinical progress of individuals [with psychological problems] in global
terms."  *Kohler* v. *Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (internal citation
omitted); *see also Petrie* v. *Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (summary
order) ("GAF is a scale that indicates the clinician's overall opinion of an individual's
psychological, social and occupational functioning.").

cognitive functioning." (*Id.*).  Dr. Cramer observed based on the interview that Plaintiff appeared to be suffering from anxiety and depression; in consequence, she referred Plaintiff to a Board-certified neuropsychologist and recommended she see a neurologist.  (*Id.*).

On October 24, 2012, Plaintiff visited psychologist Paul A. Meyer for an intake evaluation, after being referred for cognitive therapy and neuropsychological testing.  (LTD Cl. 174).  Dr. Meyer related Plaintiff's "severe headaches, seizure activity and [ ] moderate to severe cognitive deficits [that] result[ed] in her losing her job." (*Id.*).  He also noted that, according to Plaintiff, "[s]he was able to work under her previous supervisor as she was 'allowed to get by,' however, a new supervisor came into Time/Warner where [Plaintiff] was working and could assess that [her] deficits prevented her from maintaining employment." (*Id.*).  Dr. Meyer referenced Plaintiff's past "extensive neurological work up via medical and psychological testing with negative results," and noted Plaintiff's expressed concerns that she had lost memory of the past, could not learn new tasks, and was now "unable to function at an acceptable level beyond the ability to live independently." (*Id.*).  Dr. Meyer also noted that Plaintiff would be "referred to neuropsychological testing as there [was] a letter stating previous testing was inaccurate." (*Id.*).[10]  Dr. Meyer further stated, in relevant part, that Plaintiff "convey[ed] a poor short term,

---

[10]    The Court observes that a different medical professional, Dr. Christine Moyer, later made a similar comment — that "a medical consultant for the patient reviewed [Dr. Craig's] two neuropsychological evaluations and offered several criticisms." (*See* LTD Cl. 115).  However, despite reviewing both the short- and long-term disability claim records, the Court has not located the letter referenced by Dr. Meyer and Dr. Moyer.

long term memory deficit, [but] no longer ha[d] seizure activity as she [was] on a new diet for inflammation." (*Id.* at 174). Dr. Meyer diagnosed Plaintiff with cognitive deficits and adjustment disorder. (*Id.* at 173).[11]

On October 30, 2012, Plaintiff visited a rheumatology Physician's Assistant, Miranda Isom, presenting with arthralgias, joint and muscle pain, headaches, and memory loss, with symptoms that reportedly began around October 2009. (LTD Cl. 133).[12] PA Isom diagnosed Plaintiff with fibromyalgia, and explained to Plaintiff the importance of exercise, stress reduction, and management of related sleep and mood disorders. (*Id.* at 135). PA Isom also referred Plaintiff for aquatic therapy. (*Id.*).[13]

Plaintiff resumed psychotherapy with Dr. Meyer on October 31, 2012, at which time Dr. Meyer noted that Plaintiff's cognitive processes were impaired, and referred her for neuropsychological testing. (LTD Cl. 172). As with other of Plaintiff's treating professionals, Dr. Meyer stated that the etiology of Plaintiff's issues was unknown. (*Id.*). On November 7, 2012, Plaintiff again met with Dr. Meyer and discussed the results of her neuropsychological

---

[11]   "An adjustment disorder is stress-related mental illness that causes depression and anxiety in response to a life change that the individual experiencing the disorder has difficulty coping with." *Petty* v. *Colvin*, No. 12 Civ. 1644 (LTS) (RLE), 2014 WL 2465109, at *6 n.7 (S.D.N.Y. June 2, 2014) (internal citation omitted).

[12]   Arthralgia is "pain in a joint." *DiPalma* v. *Colvin*, 951 F. Supp. 2d 555, 559 n.1 (S.D.N.Y. 2013).

[13]   The record shows Plaintiff attended physical therapy from approximately November 2012 to January 2013 for musculoskeletal pain. (LTD Cl. 138-42, 175-88). Plaintiff's physical therapy records referenced her medical diagnosis of fibromyalgia and often mentioned Plaintiff's headaches and dizziness. (*See, e.g., id.* at 138, 186-87).

16

testing; Dr. Meyer observed that Plaintiff had "fair insight with cognitive deficits described in neuropsychological testing." (*Id.* at 170).

### iv.   Evaluations and Treatment in Late 2012 and the First Half of 2013

Plaintiff returned for further psychotherapy with Dr. Meyer on November 14, 2012 (LTD Cl. 167-68); November 28, 2012 (*id.* at 165-66); December 4, 2012 (*id.* at 162-63); December 11, 2012 (*id.* at 160-61); December 26, 2012 (*id.* at 158-59); January 2, 2013 (*id.* at 156-57); January 7, 2013 (*id.* at 154-55); and January 11, 2013 (*id.* at 152-53).  During these visits, Dr. Meyer observed, in relevant part, that Plaintiff's cognitive processes waxed and waned from week to week but were generally impaired, though the etiology remained unknown.  (*Id.* at 168).  Plaintiff informed Dr. Meyer that she had been exposed to black mold but lost the ensuing lawsuit; this is the earliest mention in the record of such exposure to a treating professional.[14]  With this new information, Dr. Meyer indicated in his December 26, 2012 notes that Plaintiff's symptoms were "likely caused by multiple etiologies such as black mold poisoning, workplace stress and inappropriate reaction to difficult work environment." (*Id.* at 159, 161).  On January 7, 2013, Dr. Meyer observed that Plaintiff's "cognitive difficulties [did] not appear to be sole[ly] a result of

---

[14]   The Court has reviewed the record and found no documents pertaining to this lawsuit; while documents relating to a separate landlord-tenant dispute (in which Plaintiff appeared as the defendant) were produced in the long-term disability claim record, those papers do not reference any mold-related claims.  Thus, the Court is unable to determine whether Plaintiff's "loss" of this alleged lawsuit was due to a finding that there had been no toxic mold exposure, or some other basis.

psychiatric etiology but [her] depressive/anxious [symptoms] result[ed] from memory deficits and overall cognitive difficulties." (*Id.* at 155).

Following Plaintiff's visits, on January 11, 2013, Dr. Meyer completed a "Mental Impairment Questionnaire," which indicated that Plaintiff had undergone neuropsychological testing and individual psychotherapy; while Plaintiff's depressive and anxiety-related symptoms had improved, her cognitive deficits had not. (LTD Cl. 189-94). Dr. Meyer assessed a GAF score of 45, and his clinical findings stated that Plaintiff had "very poor long and short term memory, concentration difficulties, moderate problem-solving impairment, [and her] overall poor cognitive functioning cause[d] mood [symptoms]." (*Id.* at 189). Dr. Meyer noted that Plaintiff's prognosis was poor, though even then he could not advance an etiology for her symptoms, noting simply that the matter was "being investigated." (*Id.*). Dr. Meyer further referenced Plaintiff's symptoms and noted that she was "unable to meet competitive standards" or had "[n]o useful ability to function" in 13 of 16 categories of "mental abilities and aptitudes needed to do unskilled work" (*id.* at 190-91); she further had "no useful ability to function" in all four categories of abilities necessary for skilled or semiskilled work (*id.* at 192). Dr. Meyer estimated that Plaintiff's impairments would cause her to be absent from work 60% to 80% of the time, and he indicated his assessment that Plaintiff was not a malingerer. (*Id.* at 193-94). On January 14, 2013, Dr. Meyer sent a letter to Dr. Rama Narasimhan, to whom Plaintiff had been referred, in which he recommended a PET scan, along with a possible spinal tap or ambulatory EEG, noting that he

18

"d[id] not believe that depression and/or anxiety [was] the cause of [Plaintiff's] cognitive deficits," but, rather, believed the converse.  (*Id.* at 151).

Meanwhile, on November 1, 2012, Plaintiff visited clinical psychologist Christine Moyer for a neuropsychological evaluation, in order "to assist in clarifying [her] diagnosis and to address alleged deficiencies in two previous neuropsychological evaluations." (LTD Cl. 114-21).  Dr. Moyer noted that Plaintiff reported developing cognitive symptoms approximately three years prior, around a time when she and her daughter were exposed to toxic mold in a rented home.  (*Id.* at 114-15).[15]  With regard to Dr. Craig's prior evaluations, Dr. Moyer noted that they had been criticized for using a "nonstandard measure of memory, no assessment of symptom validity, no measure of personality/emotional status and no conclusions/diagnoses/recommendations." (*Id.* at 115).  She concurred in these critiques.  (*Id.* at 119).

Dr. Moyer then conducted a number of validity tests and itemized her conclusions.  First, after administering a "Dot Counting Task," Dr. Moyer recounted that Plaintiff's performance "[a]t first glance … seem[ed] suspicious for exaggeration of symptoms"; Dr. Moyer later reasoned that one anomalous portion of the test likely skewed the results, and thus concluded that the test was not "evidence of a <u>consistent</u> attempt to exaggerate difficulties."  (LTD Cl. 116 (emphasis in original)).  On the next two tests, Dr. Moyer found Plaintiff's performance again did not "support any significant tendency to exaggerate her

---

[15]     This history contrasts sharply with those provided by Plaintiff to Drs. Miric and Craig in 2009, *see supra* at 5-7, and presumably was modified by Plaintiff to fit the timing of her purported exposure to the black mold.

difficulties" and "demonstrated a tendency to be cooperative and willing to respond in an honest fashion." (*Id.*). Dr. Moyer cautioned that the "Response Bias Scale" portion of one test "could suggest an individual who exaggerates memory complaints, [but could also suggest] an individual with significant emotional difficulties who reports credible symptoms which are genuinely distressing to her"; Dr. Moyer interpreted Plaintiff's results to suggest the latter, based on Plaintiff's reported history and presentation. (*Id.*).

Substantively, Dr. Moyer determined that Plaintiff's "overall memory functioning [was] somewhat lower than would be expected given her educational/occupational histories"; while Plaintiff had average scores for visual and immediate (i.e., short-term) memory, her scores were low average to borderline for auditory and delayed (i.e., long-term) memory. (LTD Cl. 117-18). Dr. Moyer observed that Plaintiff "demonstrate[d] significant difficulties in memory skills, particularly on tests of delayed recall of both verbal and visual material." (*Id.* at 119). Dr. Moyer noted that the etiology of Plaintiff's difficulties remained unclear, but — with no apparent knowledge of the timelines that Plaintiff had recounted to her prior treating physicians — she "attach[ed] special significance to the fact that [Plaintiff] unhesitatingly reported the onset of her cognitive/physical difficulties during a time period when she had a possible exposure to toxic mold." (*Id.* at 119-20). Dr. Moyer diagnosed Plaintiff with "adjustment disorder" and recommended "[a]ggressive treatment of depression/anxiety," continued psychotherapy, periodic

neurological follow-up, and possible repeated neuropsychological evaluations after nine to twelve months. (*Id.* at 120-21).

On January 15, 2013, Plaintiff visited Dr. Narasimhan, who noted that she "presented … with three-year history of memory problem[s] and chronic daily headaches." (LTD Cl. 149). Dr. Narasimhan recorded her suspicion of anxiety and depression and stated that Plaintiff "carrie[d] the diagnosis of chronic fatigue syndrome and most recently fibromyalgia." (*Id.*). Plaintiff brought Dr. Narasimhan the results of her three-day ambulatory EEG (*see supra* at 10), along with Dr. Meyer's note stating that Plaintiff's cognitive issues could not be explained by a mood disorder (*supra* at 17-18).

On February 19, 2013, Plaintiff visited the Mayo Clinic in Scottsdale, Arizona. There, she was observed by internist Tina Byun, who noted Plaintiff's muscle and joint pain, along with "symptoms of palpitations." (LTD Cl. 311). Dr. Byun then described Plaintiff's "flares," including "headaches, symptoms of blackouts, dizziness and palpitations." (*Id.*). As Dr. Byun's notes indicated, Plaintiff's first flare occurred approximately three years prior, "following exposure to mold in her house," and Plaintiff had "had subsequent episodes." (*Id.*). Dr. Byun noted that Plaintiff's primary concern was cognitive dysfunction, which had resulted in memory difficulties precluding Plaintiff's continued employment. (*Id.*). Dr. Byun related that Plaintiff had visited other neurologists and undergone neuropsychiatric testing, and she continued to work with a cognitive therapist. (*Id.*). Ultimately, Dr. Byun suspected fibromyalgia and functional pain disorder, though she requested consultations

with rheumatology, behavioral neurology, and headache neurology. (*Id.* at 311-12).

On the same date, internist Anjuli Brighton, also at the Mayo Clinic, conducted a general medical examination of Plaintiff. (LTD Cl. 313-16; *see also id.* at 504-07). Dr. Brighton referenced Plaintiff's joint and muscle pain and related that Plaintiff "link[ed] the development of these symptoms to exposure to a severe black mold in her house." (*Id.* at 313). Dr. Brighton noted that from September 2009 to January 2010, Plaintiff had "a flare-up characterized by a worsening severity of a chronic intermittent headache associated with difficulty speaking, memory loss, cognitive impairment, blackouts, dizziness, nausea, and palpitations." (*Id.*). Plaintiff then had a second flare-up from February to June 2012. (*Id.*). Dr. Brighton further related that Plaintiff "experience[d] memory loss, both short term and long term," and her "cognitive impairment progressed to the point where she was relieved from her occupation as a computer programmer." (*Id.*). Dr. Brighton's impressions included "[a]rthralgias and myalgias,"[16] "[h]eadache and memory loss," and palpitations. (*Id.* at 315).

On February 27, 2013, Plaintiff underwent a neurology consult with Dr. Bryan K. Woodruff at the Mayo Clinic. (LTD Cl. 508-11). Dr. Woodruff relayed a similar history of Plaintiff's illness, including three years of memory struggles and two distinct flare-ups with intensifying symptoms. (*Id.* at 508).

---

[16]   Myalgias are muscle aches. *Muscle Pain (Myalgia)*, Medicine.net, http://www.medicinenet.com/muscle_pain_myalgia/symptoms.htm (last visited Sept. 23, 2016).

Echoing other evaluators, Dr. Woodruff stated that there was "no clear antecedent event or trauma that [Plaintiff] or her providers ha[d] thus far been able to pinpoint that might have triggered this." (*Id.*).  Dr. Woodruff referenced Plaintiff's normal MRI and PET scan, but relayed examples of Plaintiff's cognitive difficulties, in terms of both long-term and short-term memory lapses. (*Id.* at 509).  In the "plan" portion of his report, Dr. Woodruff noted that "[g]iven [Plaintiff's] young age[,] in the absence of a family history of early onset cognitive decline, it seem[ed] less likely that this [was] a neurodegenerative process, but more likely that [they were] dealing with a fluctuating metabolic, autoimmune or possibly inflammatory encephalopathy." (*Id.* at 511).  Dr. Woodruff further recommended "a more exhaustive panel of laboratory investigations looking for uncommon metabolic, paraneoplastic or autoimmune causes of encephalopathy," along with an updated EEG.  (*Id.*).

In her notes from a follow-up visit on April 10, 2013, Dr. Brighton stated that pursuant to Plaintiff's recent appointment with a different doctor, "it was noted that a possible cause of her cognitive symptoms [might] include possible metabolic autoimmune or inflammatory encephalopathy," and that further testing had been ordered.  (LTD Cl. 950-51).  Dr. Brighton stated that Plaintiff "continue[d] to be able to drive and perform her activities of daily living," but "remain[ed] frustrated with lack of ability to diagnose her symptoms currently." (*Id.* at 951).  Dr. Brighton referenced a number of lab tests performed, notably including Plaintiff's recent EEG, which indicated "no definite epileptiform activity." (*Id.* at 952).  In her impressions, Dr. Brighton articulated her

23

"suspicion that chronic pain syndrome [might] be a partial explanation for

[Plaintiff's] symptoms," but "due to a progression of her symptoms and the

significant effect on her daily activity in life and the concerning functional and

cognitive impairment, [the Mayo Clinic would] continue to try to evaluate

possible autoimmune and inflammatory causes." (*Id.*).

In notes from a May 1, 2013 follow-up visit, Dr. Woodruff indicated that

the "more exhaustive battery of laboratory and other investigations to look for

the possibility of autoimmune inflammatory paraneoplastic or metabolic causes

of encephalopathy" came back "unremarkable." (LTD Cl. 955).  Dr. Woodruff

referenced a number of specific test results — including an EEG and a PET

scan — that were either unremarkable, "of doubtful clinical significance," or "in

the normal range." (*Id.*).  Dr. Woodruff stated that he "[did] not have a clear

explanation for [Plaintiff's] fluctuating cognitive symptoms," but "[could] not

rule out the possibility that [he was] simply seeing her at 1 of her more 'normal'

time points and that if she had worsening neurological symptomatology in the

future[,] follow[-]up testing might show findings that [were] not present

currently." (*Id.* at 956).  He further noted that Plaintiff was scheduled to meet

with rheumatologists who could potentially "clarify whether they [thought] her

clinical picture would be adequately explained" by her fibromyalgia diagnosis.

(*Id.*).  Dr. Woodruff recommended repeat neuropsychological assessment later

in the year "to ensure that there [was] no progression of the cognitive

symptoms documented with the last neuropsychological assessment." (*Id.*).

Ultimately, Dr. Woodruff diagnosed fibromyalgia, sleep apnea, headaches,

presyncopal (i.e., light-headed or dizzy) episodes, and "[f]luctuating cognitive symptoms with residual mild cognitive dysfunction." (*Id.*).

On May 8, 2013, Plaintiff visited Dr. April Chang-Miller and Nurse Tammy Larson-Cain at Mayo Clinic. (LTD Cl. 1053-57). While Plaintiff's visit largely focused on her pain issues, Plaintiff indicated that "[t]he cognitive dysfunction that she report[ed] ha[d] baselined but her pain [had] increased." (*Id.* at 1053). Plaintiff noted that she continued to see a cognitive therapist weekly, which Dr. Chang-Miller advised her to continue. (*Id.* at 1056-57).

### c.    Unum's Review of Plaintiff's Records

As noted, Plaintiff left Time Warner on disability leave in May 2012, and submitted a claim for disability benefits on May 22, 2012. (STD Cl. 2; LTD Cl. 2). In July 2012, Nancy Deane-Loranger, a Registered Nurse employed by Unum, reviewed Plaintiff's medical records and observed that while Plaintiff was "evaluated for reported cognitive dysfunction in 2009 with indication of some level of dysfunction based on test findings," Plaintiff had continued to work after that time. (STD Cl. 130). Nurse Deane-Loranger further noted that Plaintiff's 2012 records had referenced ongoing cognitive issues, but that some areas of functioning had improved. (*Id.*). As she concluded, "[i]t [was] unclear how [Plaintiff was] specifically impaired based on the updated testing presented," as "[t]here [was] no specific diagnosis" provided by her attending physicians, and "no treatment plan ha[d] been presented at [that] time other than reassurance and disability." (*Id.*).

25

Nurse Deane-Loranger reviewed the file again a few months later in November 2012, summarizing records from Drs. Cramer. Grout, Meyer, Moyer, Mintz, Craig, and PA Isom, and concluding that Plaintiff's medical information was "insufficient to determine" specific restrictions and limitations. Specifically, Plaintiff's complaints of pain and cognitive impairment were deemed to be "in excess of findings on clinical and physical examinations," as there was "no indication in the various medical records of specific and observed examples of [Plaintiff] having difficulty with physical movements or activities and there [was] no indication of any observed confusion or memory issues related to office visit interactions or teaching."  (STD Cl. 244-47).

A Unum medical consultant, neuropsychologist William Black, first reviewed Plaintiff's file on July 24, 2012.  (STD Cl. 134-36).  Dr. Black reviewed Dr. Craig's neuropsychological evaluations and Dr. Husar's observation notes; as he determined, "[t]he format of the two written reports [was] highly atypical of standard clinical or neuropsychological reports, and include[d] the results of minimal psychological testing."  (*Id.* at 134-35).  Dr. Black stated that the reports did not assess "most standard neurocognitive domains," used "nonstandard cognitive measures of memory and visual spatial ability," failed to assess symptom validity or emotional status, and did not contain conclusions, diagnoses, or recommendations.  (*Id.* at 135).  Further, with regard to Dr. Craig's second round of testing in 2012 with noted improvements and declines, Dr. Black found that the testing "demonstrated several test-based abnormalities of questionable validity"; as he explained, Plaintiff's results

26

indicating both significant improvements and declines amounted to an "inconsistent pattern of change," which was "atypical of cognitive disorders having a physical basis" and "raise[d] a question of invalid test performance." (*Id.*).

On December 5, 2012, Dr. Black again reviewed Plaintiff's file, focusing principally on Dr. Moyer's neuropsychological examination. (LTD Cl. 415-18). Dr. Black observed that Dr. Moyer was "not a neuropsychologist and [ ] not board-certified," and that she "administered a highly abbreviated psychological screening exam" — including "a single standard test of memory (WMS-IV), a comprehensive personality test (MMPI-2-RF), and two obsolete rarely used and low sensitivity symptom validity tests (original dot counting & Rey 15 Item Test)." (*Id.* at 416). Dr. Black indicated that this testing "does not represent the standard of practice in clinical neuropsychology and is never used in forensic and/or disability assessments." (*Id.*). Further, Dr. Black noted that Plaintiff achieved inconsistent performance on the symptom validity assessments, rendering it "questionable that [she] put forth full effort during the assessment." (*Id.*).

With regard to the substance of the testing, Dr. Black noted that Plaintiff had scored from "borderline" to "average" on the administered memory test, which he deemed to be not indicative of a significant weakness. (LTD Cl. 416). While Dr. Moyer had interpreted the response bias portion of the testing as indicative of "an individual with significant emotional difficulties who reports credible symptoms which are genuinely distressing to her," *see supra* at 20,

Dr. Black countered that such an interpretation ran "contrary to consensual professional literature relating to this scale and to standard practice in forensic/disability evaluations" (*id.*).  Dr. Black concluded that Dr. Moyer's report amounted to a "highly limited and atypical psychological (not neuropsychological) evaluation," which rendered "the available evidence [ ] both questionably invalid and significantly insufficient to validly determine [Plaintiff's] actual cognitive functioning."  (*Id.*).

On February 14, 2013, Dr. Nicholas Kletti, a board-certified psychiatrist employed by Unum, reviewed Plaintiff's file, noting that the file had been referred for review by a psychiatrist because of "concerns that claimant's symptom complaints [might] be at least in part the result of psychiatric illness," although Plaintiff's doctors had not certified psychiatric impairment. (LTD Cl. 384-90).  Dr. Kletti reviewed Plaintiff's medical history and records, her psychological testing by Dr. Craig, and its analysis by Dr. Black.  (*Id.* at 384-86).  Based on his review, Dr. Kletti found clear evidence of "a long history of somatic anxiety/preoccupation," but also found that it "remained unclear to [him] whether [Plaintiff was] actually impaired from performing her usual occupational duties."  (*Id.* at 387-88).  Dr. Kletti noted that Plaintiff's departure from her job "was in the context of an identified workplace-specific stressor — a new supervisor who had different expectations for [her] work performance."  (*Id.* at 388-89).  Dr. Kletti found that "it [did] not appear that any actual cognitive dysfunction/impairment ha[d] been demonstrated by repeated testing and clinical examinations, and treatment planning and intensity appear[ed]

28

inconsistent with cognitive dysfunction so severe as to preclude ability to work." (*Id.* at 389).  More troublingly, Plaintiff's records suggested to Dr. Kletti that she might "be capable of greater functional abilities than what she or her [Attending Physicians] [ ] reported."  (*Id.*).

On March 7, 2013, Anne Marie Murphy, another Registered Nurse employed by Unum, conducted a review of Plaintiff's file, evaluating medical records from, among others, Drs. Miric, Narasimhan, Meyer, Grout, Cramer, Moyer, Mintz, Craig, Byun, Husar, and PA Isom, in addition to Plaintiff's physical therapy records.  (STD Cl. 507-17).  Nurse Murphy summarized Plaintiff's records in detail before concluding that, *inter alia*:

(i) Plaintiff had a "longstanding history" of memory-related complaints;

(ii) Her records back to 2009 demonstrated "extensive medical work-up for cognitive and physical complaints," but a consistent failure to determine any etiology;

(iii) No "significant findings [had been] noted on multiple clinical exams and diagnostic testing to explain the presence and severity of reported symptoms";

(iv) While Plaintiff had referenced negatively impacted work performance, her supervisors had not provided accommodations, had not issued any warnings, and, perhaps most significantly, had not observed any performance issues;[17]

(v) Despite her purported cognitive issues in 2009, Plaintiff had continued to work at a job that "reportedly entailed complex intellectual tasks and calculations";

(vi) Evaluations by Dr. Mintz and Dr. Husar contemporaneous with Plaintiff stopping work "did not identify neurological or other deficits, nor

---

[17] As noted, the record does not provide clarity on the circumstances of Plaintiff's departure, apart from her comment that, after informing her supervisor that she was ill, Human Resources instructed her to go on short-term disability.  (*See supra* at 12 n.8).

acute/significant findings to explain the reported symptoms, severity, intensity and associated loss of function";

(vii)   Plaintiff had presented no evidence of any treatment between June 15, 2012, and August 1, 2012, or between August 2012 and October 23, 2012, both during the elimination period; and

(viii)  Plaintiff's move to Arizona "would entail and indicate capacity for higher level/critical thinking, problem-solving, follow-through, focus and attention to detail."

(*Id.* at 515-17).  Accordingly, she determined that Plaintiff's files "[did] not support loss of function as of the last day worked, nor as of 6/24/12 and beyond." (*Id.* at 517).  As she noted, "[d]espite the reported severity, intensity and duration of symptoms and impact on function, [Plaintiff's] complaints [were] chronic, inconsistently reported[,] and significantly in excess of clinical and diagnostic findings," with noted gaps in treatment.  (*Id.*).

On March 13, 2013, Stacy Bennett, a Registered Nurse at Unum, reviewed Plaintiff's file, including records from Drs. Husar, Narasimhan, Miric, Woodruff, Grout, Mintz, Byun, Brighton, Craig, Cramer, Meyer, Moyer and PA Isom, in addition to Plaintiff's physical therapy records and Unum's reviews by Dr. Black, Dr. Kletti, and Nurse Deane-Loranger.  (LTD Cl. 520-28).  Nurse Bennett reviewed these records in detail and summarized that Plaintiff reported a "multi-year history of fluctuating memory/cognitive dysfunction with 2 noted 'flares' of worsening cognitive symptoms coupled with headaches, speech disturbance and heightened stress/anxiety." (*Id.* at 523-27).  She further noted that Plaintiff had undergone "extensive evaluation by specialty providers that [ ] included diagnostic, laboratory, and neuropsychological

testing with no clear etiology of symptoms found, though symptoms [were] noted to be exacerbated by stress [and] anxiety." (*Id.* at 527). Nurse Bennett also observed that "[n]europsychological testing [was] noted to demonstrate memory/cognitive issues, [but Plaintiff] ha[d] consistently been documented to demonstrate minimal to no deficits on bedside (office) testing." (*Id.*). She concluded that while Plaintiff reported significant cognitive dysfunction, "current medical documentation on file [did] not reflect the level of symptomatology that [Plaintiff] report[ed] and [Plaintiff was] noted to have limited to no impairment in her daily functioning." (*Id.* at 528).

Dr. Jana Zimmerman, a clinical neuropsychologist with Unum, first reviewed Plaintiff's file in the context of her short-term disability claim on March 26, 2013. (STD Cl. 521-30). Dr. Zimmerman reviewed and summarized in detail records from Drs. Moyer, Craig, Cramer, and Meyer, and the review from Nurse Murphy (*id.* at 523-27), and she ultimately concluded that the proffered restrictions and limitations for Plaintiff's cognitive and psychiatric conditions were not supported by the medical evidence. (*Id.* at 527). Dr. Zimmerman noted that Plaintiff's doctors frequently relied on Plaintiff's own representations of her condition, but that Plaintiff "inconsistently reported to misrepresented her medical history, current cognitive symptoms and other issues critical to an accurate assessment across providers." (*Id.*). For example, Plaintiff (i) provided conflicting accounts of the timing of the onset of her symptoms; (ii) inconsistently cited her exposure to mold around the time of onset; and (iii) inconsistently reported her symptoms leading to her job loss.

(*Id.* at 527-28).  Dr. Zimmerman further noted that the neuropsychological exams did not assess effort, while "two embedded SVTs [symptom validity tests] in the intelligence domain were failed."  (*Id.* at 528).  Dr. Zimmerman concluded, based on the inconsistent patterns of results within and among tests — including the lack of "consistent direction of change in intellectual performances across exams" — in conjunction with Plaintiff's varied reporting of her symptoms and medical history, that the testing did not represent Plaintiff's true abilities.  (STD Cl. 528-29).

### d.    Unum's First Roundtable and Follow-Up

Unum held its first internal conference, or "Roundtable," on Plaintiff's long-term disability claim on April 24, 2013.  (LTD Cl. 840-41).  The notes from the Roundtable recapitulated the history of Plaintiff's condition — beginning in 2009, involving two "flares," and leading Plaintiff to cease working on May 18, 2012.  (*Id.* at 840).  The notes further reflected Dr. Meyer's treatment, and indicated that while Plaintiff "report[ed] significant cognitive deficits," she "provide[d] inconsistent reports of [her] activities," rendering the "medical picture" unclear.  (*Id.* at 840-41).

### i.    Unum's Field Investigator Interview

Two days after the Roundtable, on April 16, 2013, Plaintiff met with Linda Moses, Unum's claim investigator, at Plaintiff's attorney's office.  (LTD Cl. 789-97).  Plaintiff informed Moses that "as a result of [her] cognitive dysfunction, she [could] no longer perform her job, and due to the pain of [her] fibromyalgia, she [could not] work at any job."  (*Id.* at 789).  Moses noted that,

during the course of the interview, Plaintiff's "speech was halted at times as if she were trying to formulate the right words and sentences," and "[w]hen she could not remember a word or an answer, she would close her eyes and appeared to struggle and be slightly frustrated." (*Id.* at 789-91). Moses observed that Plaintiff's "memory appeared poor, and [Plaintiff] stated that there [were] blocks of her memory that were gone, [e.g.,] she d[id] not remember her college graduation." (*Id.* at 791). Also, Plaintiff reportedly could not remember certain doctors' names, her prior medications, or her children's birthdates. (*Id.*).

Plaintiff advanced "Version 2.0" of the history of the onset of her symptoms; she informed Moses that "three years prior to 2012, she and her daughter became very ill and found that she had been exposed to mold from her home." (LTD Cl. 792). While Plaintiff's then-supervisor at Time Warner "was very understanding and allowed [Plaintiff] to work from home and decrease her hours" during that time, Plaintiff began "experiencing more severe headaches, muscle and joint pain and periods of blackouts" around January 2012, i.e., during her second flare. (*Id.*). Plaintiff stated that her work suffered as a result, and her supervisor referred her to the Human Resources Department, who in turn informed her that she must go on short-term disability. (*Id.*). As Moses recorded, Plaintiff moved to Arizona in July or August of 2012, "because a doctor at Mayo Clinic thought it could help her." (*Id.* at 793). She indicated that her 17-year-old son, who previously lived with her ex-husband in Florida, moved to Arizona to assist her. (*Id.*).

33

Moses stated that Plaintiff had received no diagnosis or treatments, and that she could not tolerate medications. (LTD Cl. 793-94). With regard to restrictions and limitations, Plaintiff informed Moses that "her only doctor restrictions [were] to do only what she [could]," and that "she must move around or she [would] stop being mobile." (*Id.* at 794). Plaintiff stated that her doctors believed brain inflammation was causing her issues. (*Id.*).

With regard to her daily activities, Plaintiff informed Moses that she could do grocery shopping "on good days," but her son usually accompanied her. (LTD Cl. 796). She also noted that while she continued to drive, she only drove to medical appointments and for short errands; "[w]hen possible, her son [drove] her." (*Id.*). Otherwise, on a good day, Plaintiff would help her daughter get ready for school in the morning, do light cleaning and housework, and go to the gym to use a stationary bicycle; on bad days, she would stay in bed. (*Id.* at 795-96).

### ii. Unum's Requests for Additional Information and Reviews of That Information

Following the Roundtable, on April 30, 2013, Unum also sent a letter to Dr. Meyer, asking whether (i) he certified psychiatric impairment; (ii) he would provide psychiatric restrictions and limitations; (iii) he recommended mental health treatments; and (iv) Plaintiff's condition might improve with regular care. (LTD Cl. 848-49). Dr. Meyer initially responded on May 28, 2013, indicating that he had no opinion as to psychiatric impairment, that the etiology of Plaintiff's conditions was unknown, and that he recommended 90

34

minutes of mental health treatment once per week, though he did not know if Plaintiff's condition would improve.  (*Id.* at 978-79).

Dr. Meyer sent a further letter a few days later, on June 3, 2013; in it, he indicated that he had engaged in psychotherapy with Plaintiff on a weekly basis from October 2012 through May 2013.  In that setting, he observed Plaintiff "struggle with memory deficits, word finding difficulties and overall major cognitive functioning that would make it difficult for her to maintain employment at even a low level skilled position." (LTD Cl. 1048).  Dr. Meyer stated that Plaintiff benefited from psychotherapy, as it allowed her to "vent frustration [about] her condition, unknown etiology, and inability to function at her previous level," and he further noted that "[i]t appear[ed] as if her severe cognitive deficits [were] due to some unknown physical etiology as she was exposed to toxic black mold, ha[d] other debilitating symptoms (see medical chart), and again, etiology [was] unknown." (*Id.*).

The Roundtable participants also followed up with Dr. Husar and Dr. Craig, asking each whether, in light of the time that had passed since his consultation, he deferred comment on Plaintiff's restrictions and limitations to her current treating physician, and if not, what Plaintiff's restrictions and limitations were.  (LTD Cl. 855-56, 874-75).[18]  Dr. Husar did not defer to Plaintiff's current physician, and wrote that Plaintiff had "significant cognitive dysfunction on neuropsychological testing and [was] attending cognitive

---

[18]    Unum's letters did not state the identity of the referenced treating provider, nor was that information made clear by the notes from the Roundtable.

rehabilitation." (*Id.* at 862).  Dr. Craig stated:  "As I am sure you have a copy of my original evaluation of this patient and the 2012 update/re-evaluation you can see she has severe cognitive and memory impairments which obviously preclude her from resuming her prior work as well as any other work duties." (*Id.* at 874).

On June 6, 2013, Dr. Black conducted another review of Plaintiff's file, which had been supplemented by this additional information.  (LTD Cl. 982-85).  Dr. Black reviewed records and correspondence from Drs. Moyer, Meyer, Craig, Husar, and Woodruff, in addition to Plaintiff's CT and PET scans, her EEG report, and the Unum reviews by Drs. Zimmerman, Kletti, Black, and Nurse Murphy.  (*Id.* at 983-84).  Dr. Black first noted (i) Dr. Husar's finding of "significant cognitive dysfunction on [neuropsychological] testing" and (ii) Dr. Craig's finding of "severe cognitive and memory impairments which preclude[d] [Plaintiff] from her prior work as well as any other work duties."  (*Id.* at 983). Again, Dr. Black concluded that physically-based cognitive restrictions and limitations were not supported.  (*Id.* at 984).  He based this determination on the medical evaluations and raw data, finding "no cognitive/emotional data which provide[d] consistent and compelling support for cognitive or M&N [mental and nervous] R&Ls [restrictions and limitations]."  (*Id.*).  Dr. Black concurred with Dr. Zimmerman's determination that the neuropsychological testing conducted by Dr. Craig was "highly limited and omit[ted] measures of performance validity and personality testing," and that the testing conducted

36

by Dr. Moyer was "noncredible due to a significant over-reporting/exaggeration of generalized physical malaise and cognitive complaints." (*Id.* at 984-85).

Separately, Dr. Black noted Plaintiff's ability to plan and execute a cross-country relocation and to parent her two children; he deemed the discrepancy between Plaintiff's asserted impairments and her apparent functional capacity "implausible," and stated that Plaintiff's symptoms could not "be logically explained on the basis of a physically-based cognitive condition." (LTD Cl. 985). For all of these reasons, Dr. Black disagreed with Dr. Craig's assessment of a physically-based cognitive impairment. (*Id.*).

In the wake of this review, on June 7, 2013, Dr. Black sent another letter to Dr. Craig, stating that Unum's reviews of Plaintiff's file had "not found credible and consistent evidence of a cognitive condition based on a physical etiology," as there had been "no neurodiagnostic evidence of a neurologic condition which could plausibly produce ongoing cognitive deficits." (LTD Cl. 987). Accordingly, Dr. Black asked whether, given that Dr. Craig had last treated Plaintiff more than a year earlier, on May 11, 2012, Dr. Craig would defer a determination of Plaintiff's work capacity to her current providers; if not, Dr. Craig was asked to provide his basis for finding ongoing impairment, along with the more likely etiology of the deficits, whether neurological or behavioral. (*Id.* at 987-88). On June 13, 2013, Dr. Craig wrote back, largely without responding to Unum's questions; he stated that he would not defer to any current provider unless they were not employed by Unum and further wrote, in response to the request for information concerning the most likely

37

etiology of impairment, "[a]re you serious?  Just look at her scores now and then the level at which she functioned prior to onset."  (*Id.* at 1014).  At the bottom of the page, Dr. Craig wrote, "I believe you are only trying to deny benefits however you can."  (*Id.*).  On June 17, 2013, Dr. Black made an administrative note in Plaintiff's file that Dr. Craig "failed to provide substantive responses to any of the narrative questions," and "basically communicated indignation and an impression that Unum is trying to deny benefits however [it] can."  (*Id.* at 1019).  Dr. Black further noted that "[t]he additional information [did] not resolve the difference of opinion or cause [Dr. Black] to alter [his] impressions as stated in the Written File Review."  (*Id.*).

A month later, on July 23, 2013, Dr. Black sent a letter to Dr. Meyer, asking whether Dr. Meyer's opinion of no "psychiatric impairment" was retroactive to the date of first treatment in 2012.  (LTD Cl. 1129).  On July 25, 2013, Dr. Meyer responded that his opinion was retroactive to that date.  (*Id.* at 1142-43).[19]

On June 7, 2013, Dr. Nancy Heimonen, a board-certified OB/GYN affiliated with Unum, completed a review of Plaintiff's file.  (LTD Cl. 990-96). Dr. Heimonen reviewed in detail Plaintiff's treatment with Drs. Husar, Narasimhan, Byun, Brighton, Woodruff, and PA Isom (*id.* at 992- 93), ultimately concluding that Plaintiff's records did not support restrictions and

---

[19]     Plaintiff makes much of Unum's failure to ask Dr. Meyer whether he certified *cognitive* impairment.  (Pl. Br. 21).  However, as Plaintiff simultaneously acknowledges, Dr. Meyer had previously certified cognitive impairment (*id.*; *see also* LTD Cl. 173), and it is equally, if not more, plausible that Unum was relying on this earlier certification rather than being "deceptive."

limitations (*id.* at 993-94).  As she explained, the only "physical medical providers" supporting Plaintiff's inability to work were neurologists Dr. Husar and Dr. Narasimhan; however, Dr. Husar had last treated Plaintiff almost a year earlier, in August 2012, and "the basis of his ongoing support for [Plaintiff's] inability to work [was] uncertain." (*Id.* at 994).  Further, Dr. Narasimhan had advised that Plaintiff could not work due to memory issues but should be re-evaluated in one month, though it was not clear that Plaintiff had ever followed up with her.  (*Id.*).  Moreover, repeated testing had not yielded a physically-based etiology for Plaintiff's complaints, and the testing that had been performed had come back normal.  (*Id.*).

As Dr. Heimonen observed, while medical evidence supported Plaintiff's chronic pain/fibromyalgia diagnosis, "patients with fibromyalgia [were] typically encouraged to stay active with [physical therapy], aqua therapy, stretching programs and activities … and it [would be] unusual for this condition in and of itself to preclude primarily seated work capacity." (LTD Cl. 994).  Further, while Plaintiff had reported severe headaches, her records indicated that she did not use any medication for these; Dr. Heimonen deemed "[t]he lack of need for headache mediations [ ] inconsistent with headaches that interfere with ongoing physical functional capacity."  (*Id.* at 994-95).[20]

---

[20]     The Court observes that Dr. Heimonen did not acknowledge Plaintiff's claim that she was intolerant to medications previously prescribed, rendering questionable her conclusion on this basis that Plaintiff did not "need" pain medications.  (*See, e.g.,* LTD Cl. 793-94; *see also id.* at 317 (Dr. Brighton's records indicating "[n]ausea and vomiting" as adverse reactions to a number of medications)).

Dr. Heimonen also identified a number of inconsistencies in the records of Plaintiff's treating medical professionals, including: (i) gaps in Plaintiff's medical records that were "inconsistent with her reports of three years of cognitive problems and pain," including during the elimination period; (ii) a lack of clarity as to "what about her condition changed as of 5/18/12 to preclude work capacity"; (iii) an absence of medical records documenting Plaintiff's cognitive rehabilitation as directed by Dr. Husar; (iv) a lack of evidence that Dr. Husar, after diagnosing fibromyalgia, recommended any treatment; (v) Plaintiff's failure to follow up with PA Isom regarding treatment recommendations for fibromyalgia, which also was "inconsistent [with] functionally limiting pain or fatigue complaints"; and (vi) Plaintiff's general "lack of need for pain medications."  (LTD Cl. 995).  Dr. Heimonen found Plaintiff's activities of daily living to be incompatible with her "functionally limiting pain complaints," and concluded that there was "insufficient evidence to support that [Plaintiff] ha[d] a physically based medical condition associated with [restrictions and limitations] that would preclude the physical demands" of her occupation.  (*Id.*).

Dr. Heimonen then contacted Dr. Husar, articulating her understanding of the physical, cognitive, and mental- and stress-related demands of Plaintiff's occupation, and stating that she did not find evidence of a physically-based medical condition precluding Plaintiff from undertaking those demands.  (LTD Cl. 999-1000).  Dr. Heimonen asked if Dr. Husar agreed or would defer to Plaintiff's treating provider; if not, the letter asked what part of Plaintiff's

40

medical condition precluded those occupational demands.  (*Id.* at 1000).  In response, Dr. Husar indicated that he would defer to Plaintiff's treating provider.  (*Id.* at 1088).

Dr. Heimonen sent Dr. Narasimhan a similar letter.  (LTD Cl. 1005-07).  In response, Dr. Narasimhan did not agree or defer to Plaintiff's treating providers; she indicated that Plaintiff had "memory problems secondary to depression/cognitive dysfunction as evidenced in neuropsychology evaluation," in addition to suffering from fibromyalgia.  (*Id.* at 1029).  She offered nothing, however, concerning the etiology of these conditions.

On June 20, 2013, another Unum reviewer, neuropsychologist Malcolm Spica, evaluated Plaintiff's file.  (LTD Cl. 1062-66).  Dr. Spica relayed Dr. Craig's assessment of permanent cognitive impairment and Dr. Meyer's diagnosis of adjustment disorder, and contrasted these with Dr. Zimmerman's determination that Plaintiff's cognitive restrictions and limitations were not supported.  (*Id.* at 1062-63).  Dr. Spica reviewed Plaintiff's records from Drs. Husar, Craig, and Moyer, and stated that he found "no medical or neuropsychological support for a physically-based cognitive disorder," as Plaintiff's "test data [was] inconsistent across evaluations and [was] of questionable validity."  (*Id.* at 1063-64).

As Dr. Spica reasoned, the 2009 testing administered by Dr. Craig was of dubious validity, as no symptom validity testing or mood testing had been involved, and Plaintiff's "pattern of performance" on the testing had not been "consistent with a specific neurocognitive syndrome," but rather, had been

41

"consistent with lapses in effort/motivation."  (LTD Cl. 1064).  With regard to Dr. Craig's 2012 testing, Dr. Spica stated that it "was again unusually brief and devoid of effort/motivation testing or mood status assessment."  (*Id.*). There, too, Plaintiff's "pattern of performance did not correspond to a neuropsychological syndrome other than lapses in effort," and her inconsistent performance "suggested non-neurologic etiology[, e.g.,] she provided impaired performances on some tasks of verbal memory, and intact performances on additional tasks," including "Memory for Stories" and "Word Selective Reminding Test."  (*Id.*).

Dr. Spica next addressed what he termed Dr. Moyer's "idiosyncratically brief examination," which he deemed "tailored to minimally address the shortcomings in Dr. Craig's examinations; [her] use of obsolete and low-sensitivity symptom validity measures appear[ed] unusual."  (LTD Cl. 1065). Dr. Spica noted that Dr. Moyer's testing results "had little correlation with those of Dr. Craig," further suggesting "problems with motivation/effort," and determined that as Plaintiff had "no known neurological etiology, the most likely cause for her non-plausible pattern of scores [was] suboptimal effort." (*Id.*).  Moreover, Plaintiff's test results were "well within normal limits across neurocognitive domains including on tasks known to be sensitive to cerebral compromise," such as general intellect, abstract reasoning, commonsense reasoning, mental speed, visual analysis, mental sequencing, new learning, memory for verbal material, and memory for visual material.  (*Id.*).  Accordingly, Dr. Spica determined that Plaintiff's testing was "not consistent with a

debilitating neurocognitive disorder," and he identified "no medical or neuropsychological support for a physically-based cognitive disorder," given the testing data's inconsistency across evaluations and questionable validity. (*Id.*).

On July 17, 2013, Dr. Alan Neuren, a board-certified neurologist and psychologist affiliated with Unum, reviewed Plaintiff's file, attempting to reconcile the conclusions of Plaintiff's treating physicians and Unum's Dr. Heimonen. (LTD Cl. 1110-16). Dr. Neuren reviewed records of Drs. Mintz, Husar, Narasimhan, Craig, Grout, Meyer, Moyer, Miric, Byun, Brighton, Woodruff, and PA Isom, among others, in addition to Plaintiff's diagnostic studies. (*Id.* at 1111). Dr. Neuren summarized Plaintiff's records in detail (*id.* at 1111-15), ultimately concluding that Plaintiff had presented "no significant findings or findings that would either account for her complaints or rise to a level of impairment" (*id.* at 1115-16).

Dr. Neuren noted that Plaintiff's neuropsychological testing had been "limited, not comprehensive, and not credible," with no validity testing and "marked variability both with areas of significant improvement and also significant decline," rendering the testing as a whole "not credible or consistent with a dementing process." (LTD Cl. 1116). Dr. Neuren also deemed it not credible that, with her alleged cognitive complaints, Plaintiff would be capable of living independently, caring for her children, or planning and executing a cross-country move. (*Id.*). Moreover, Dr. Neuren noted, "repeated neurological evaluations including [by] the Mayo Clinic [had] failed to demonstrate the

presence of any neurological/organic/metabolic or other physically based condition that would result in cognitive problems." (*Id.*).

### e. Unum's Denial of Plaintiff's Long-Term Disability Claim

In its initial decision denying long-term benefits, dated August 14, 2013, Unum stated that it had "determined [Plaintiff] was able to perform the duties of her own regular occupation prior to the end of the claim elimination period," and thus, "[b]ecause she was not continuously disabled throughout the claim elimination period, benefits [were] not payable." (LTD Cl. 1188-89). In supporting its decision, Unum noted that "[t]he information reviewed reflected that [Plaintiff] ha[d] been extensively worked up in New Jersey and Arizona with no significant findings that would either account for her above reports or rise to a level of impairment." (*Id.*).

Unum further stated that "[t]he available records [did] not provide sufficient or consistent evidence of neurocognitive dysfunction that rises to a level of impairment." (LTD Cl. 1189). In this regard, Unum explained that Plaintiff's November 2012 examination by Dr. Moyer "revealed incomplete validity/effort," and "[s]uch lapses in effort [could] also account for her previous examinations from Dr. Craig (when effort was not assessed)." (*Id.*). Unum stated that Dr. Craig's findings were "not supported by the clinical data," and restrictions and limitations based on Plaintiff's neurocognitive complaints were "not supported." (*Id.*).

Moreover, Unum pointed to Plaintiff's ability "to live independently and manage caring for her children," along with her relocation to Arizona and

"ability to continue to function in a new area despite her reported cognitive problems." (LTD Cl. 1189).  As Unum stated, "[i]t [was] inconsistent that an individual with true cognitive disorder would be able to engage in such activities." (*Id.*).

Finally, Unum pointed to "repeated neurological evaluations including those conducted at the Mayo Clinic," all of which "failed to demonstrate the presence of any neurological/organic/metabolic or other physically based condition that would result in cognitive problems." (LTD Cl. 1189).  Unum stated that "impairment related to any behavioral health condition" also was not supported by Plaintiff's medical information, and "no attending physician [was] opining any restrictions or limitations relative to any behavioral health condition." (*Id.* at 1189-90).

Overall, Unum determined that Plaintiff's "reports of impaired function [were] inconsistent when compared with her actual findings on extensive diagnostic testing and her known activities," and Unum had "concluded she was not impaired from performing her occupational demands as a Senior Programmer due to any physical or cognitive condition from the date she stopped working on May 18, 2012 through the end of her claim elimination period which ended on November 16, 2012." (LTD Cl. 1190).

Unum advised Plaintiff that she had a right to appeal from this decision. The portion of the denial letter concerning requests for appeal indicated that Plaintiff would "need to submit a written letter of appeal outlining the basis for [her] disagreement," which letter should "include any additional information

45

[she] would like considered," including written comments, documents, or other information.  (LTD Cl. 1191-93).

### f.    Plaintiff's Appeal from Unum's Denial of Her Claim

On January 20, 2014, Plaintiff appealed Unum's adverse determination (LTD Cl. 1233-36); along with her appeal, she submitted a disability evaluation from psychologist Dr. Robert Crago (*id.* at 1237-50), along with copies of two articles authored by Dr. Crago (*id.* at 1251-74), and a letter from Dr. Moyer (*id.* at 1275).  Plaintiff's appeal letter argued that "[d]ue to her objectively-documented cognitive deficits, [Plaintiff] was and remain[ed] unable to perform the material and substantial duties of her regular occupation as a Senior Programmer Analyst."  (*Id.* at 1233).  Plaintiff "believe[d] that Unum [was a] conflicted fiduciary whose financial conflicts of interest drove the decision to deny her claim," and she provided a list of questions and demands for information to Unum including, *inter alia*, (i) copies of internal claims department spreadsheets referring to her short- or long-term claims; (ii) information and data pertaining to certain terminology used during Unum's claims process, including, among others, "liability acceptance rate," "net termination ratio," and "historic pay rate"; (iii) the amount of reserves set aside by Unum for Plaintiff's claim prior to denial; (iv) the number of claims reviewed, and statistics of approval or denial, for a number of Unum medical professionals involved in Plaintiff's case; and (v) the policies and procedures regarding "the weight to be given to the opinions of a claimant's treating physicians when Unum evaluates a disability claim."  (*Id.* at 1233-35).  Plaintiff

expressed her belief that her "file [was] replete with information confirming her ongoing disability due to an organic/physical cognitive disorder," and echoed Dr. Craig's conclusion that Unum was "simply trying to deny her claim however it [could]." (*Id.* at 1235).

Dr. Crago submitted a disability evaluation of Plaintiff dated December 2, 2013; his evaluation was based solely on a review of Plaintiff's medical records, with no examination conducted of Plaintiff. (LTD Cl. 1237-50). Dr. Crago first described his specializations, and stated that "[b]ecause of [his] training, background, and experience in the area of assessment and treatment of individuals who have been exposed to toxic molds, [he was] qualified to address these issues in the case of [Plaintiff]." (*Id.* at 1237). Dr. Crago then recounted the observations of a number of Plaintiff's treating physicians, commenting on the reasons he believed their notes corresponded to toxic mold exposure. (*Id.* at 1238-43). For instance:

- With regard to Dr. Miric's observations that Plaintiff had five years of memory problems, but that Dr. Miric wanted to rule out a number of conditions, including demyelating disease, organic brain syndrome, and somatization disorder, Dr. Crago wrote, "[i]t is noteworthy that … her presentation was confusing enough to suspect multiple problems and to make differential diagnosis difficult. This is typical of cases of toxicity." (*Id.* at 1238).

- Based on PA Isom's reference to a family history of autoimmune diseases, Plaintiff's complaints of "multiple symptoms in multiple organ systems," and diagnoses including fibromyalgia and arthralgias, Dr. Crago commented, "[t]his is the classic presentation of toxicity." (*Id.* at 1238-39).

47

- With respect to Plaintiff's abnormal EEG testing, Dr. Crago noted, "[d]ysregulation of EEG activity is common in toxic states including seizures, diffuse and or focal slowing, etc." (*Id.*).

- After evaluating Dr. Brighton's comments regarding Plaintiff's joint and muscle pains, headaches, and reference to black mold exposure, Dr. Crago wrote, "I met many patients who were evaluated at the Mayo Clinic seeking an explanation for their symptoms before they themselves knew the problem was mold.... It is still not unusual for toxic patients to be viewed as psychiatric patients when their physicians are unfamiliar with the effects of toxic mold." (*Id.* at 1240).

- In light of Dr. Woodruff's fibromyalgia diagnosis, Dr. Crago stated that "[o]ne out of five toxic mold patients can be diagnosed as having fibromyalgia." (*Id.*).

In his discussion, Dr. Crago then stated:

> I believe there is confusion in regards to the etiology of [Plaintiff's] problems because the possible effects of exposure to toxic molds [were] not addressed in her previous medical care by anyone who had proper education and background training in this area. [Plaintiff] presents with classic symptoms of an individual who was exposed to toxic mold. She also presents with a medical profile of an individual who would be more vulnerable to exposure to toxic molds.

(LTD Cl. 1243). Dr. Crago noted that "the most common clinical presentation [of exposure to toxic mold] is multiple symptoms of multiple organ systems," and stated that based on his research, "toxic mold patients presented with multiple symptoms in all categories at a significantly higher level than [ ] other medical patients." (*Id.* at 1244). Dr. Crago concluded that Plaintiff's "symptoms [were] primarily organic/physical in nature and not due to mental illness," and stated that her condition would prevent her from performing the regular duties of her occupation, as her symptoms would be variable and she

48

would "not be able to complete a normal work day work week without significant interruptions or absences." (*Id.* at 1244-45). With regard to restrictions and limitations, Dr. Crago stated that Plaintiff would need to "lead a rather disciplined life," pacing herself to manage her lack of energy and her stress, and would be required to "avoid exposure to common toxins." (*Id.* at 1246).

In response to Unum's critique of the tests administered by Dr. Moyer, Dr. Crago expressed his belief that Dr. Moyer's neuropsychological testing used "a flexible battery [of tests] where one chooses the tests necessary for the assessment of the presenting complaints," which he deemed the "more common practice" than a fixed battery of tests. (LTD Cl. 1246). Dr. Crago further opined that patients' performance on testing "in a quiet environment with no distractions" often was not representative of their functioning "in a natural environment." (*Id.* at 1246-47).

In sum, Dr. Crago stated that Plaintiff's "reported exposure to toxic molds" and "history of autoimmune disease" accounted for her symptoms, and he believed the cause of her ailments was physical, rather than due to mental illness. (LTD Cl. 1247). Dr. Crago pronounced that he did not think Plaintiff could ever return to her previous job. (*Id.*).

Clinical psychologist Dr. Moyer, in her supplemental submission, did not conduct another evaluation of Plaintiff, but merely opined that "after reviewing Dr. Crago's evaluation, toxic exposure and/or autoimmune disorder seem[ed] likely." (LTD Cl. 1275). She further concurred in Dr. Crago's assessment that

49

Plaintiff would not be able to return to her prior occupation, as she "would expect [Plaintiff] to have problems in multi-tasking, meeting deadlines, and remembering procedures, policies, assignments, passwords, etc." (*Id.*).  Dr. Moyer also observed that "there was no compelling evidence that [Plaintiff] attempted to 'fake bad' or malinger on tests of cooperation/motivation," and she recommended that Plaintiff continue her treatments for her resultant anxiety and depression, and that Plaintiff "consult with a vocational rehabilitation specialist to explore alternative careers." (*Id.*).

### g.   Unum's Second Roundtable and Follow-Up Investigation

On January 23, 2014, Unum conducted a second Roundtable regarding Plaintiff's claims.  (LTD Cl. 1335-37).  The notes from the Roundtable indicated that Unum had contacted Drs. Husar, Narasimhan, Meyer, Craig, and Grout. (*Id.* at 1335).  They further indicated that there was no evidence of medical treatment between June 15 and August 1, 2012, or between August 12 and October 23, 2012, yet sometime during this period, Plaintiff "planned and executed a move with her 10 year old daughter from [New Jersey] to [Arizona]." (*Id.* at 1335-36).  The "medical discussion" portion of the notes stated that "the premise for the appeal [was] the underlying etiology of reported cognitive deficits," with opinions from Dr. Crago and Dr. Moyer as to toxic mold exposure.  (*Id.* at 1337).  The Roundtable participants then established two issues to be addressed on review: (i) whether the evidence supported restrictions and limitations as of Plaintiff's date of disability; and (ii) whether those restrictions and limitations would "prevent reliable sustained functional

50

activity" as of that date.  (*Id.*).  On January 28, 2014, following the Roundtable,
Nurse Murphy prepared a medical summary of Plaintiff's file, noting
correspondence with Plaintiff's physicians and their conclusions and
diagnoses.  (*Id.* at 1338-41).

On January 28, 2014, Dr. Zimmerman conducted a second review of
Plaintiff's file, noting that a number of additional neuropsychological records
and correspondence had been added since her March 2013 review, including
from Drs. Linehan, Craig, Meyer, Crago, and Moyer, and a summary by Nurse
Murphy.  (LTD Cl. 1342-52).  Dr. Zimmerman then recounted in detail the
documents and letters from those doctors (*id.* at 1344-47), and concluded that
the evidence, as supplemented, still did not support restrictions and limitations
as of the date of Plaintiff's disability (*id.* at 1347).

As Dr. Zimmerman observed, the evidence "indicated [Plaintiff] had a
longstanding psychiatric history (although denied and/or misrepresented as
evident on comparison of psychiatric history to certain providers) that likely
involved cognitive symptoms"; she also noted Plaintiff's Adderall and Xanax
prescriptions, which she presumed were for cognitive and anxiety-related
issues, respectively.  (LTD Cl. 1347).  Dr. Zimmerman noted that as of 2009,
Plaintiff "reattributed her symptoms from psychiatric to medical/physical
cause and/or secondary to medical conditions," following which she underwent
a "several year series of specialty evaluations before and after work stoppage."
(*Id.* at 1347-48).

In summary, Dr. Zimmerman stated that, despite seeing four neurologists and two neuropsychologists, among other doctors, "the lack of consistency in [Plaintiff's] report was the defining factor." (LTD Cl. 1348).  Dr. Zimmerman pointed to Plaintiff's repeated reports to physicians that her work performance had declined and she had been warned about potential termination, whereas her supervisor indicated that while "they noticed she was listless and weak with loss of energy," there were no performance problems, warnings, or accommodations.  (*Id.*).  Similarly, Plaintiff provided inconsistent reports of her past medical history and the timing of her onset of symptoms; notably, she informed Dr. Miric in 2009 that her memory problems had started five years earlier, whereas by 2012, she told multiple providers that they had begun in late 2009.  (*Id.*).  Moreover, Dr. Zimmerman noted, Plaintiff provided inconsistent reports to Mayo Clinic providers within a matter of days; while Plaintiff told Dr. Brighton that she suspected black mold exposure as a cause of her symptoms, and also mentioned "toxoplasmosis with anemia" during childhood, just one week later, Dr. Woodruff was told that neither Plaintiff nor her providers had identified any antecedent event or trauma.  (*Id.* at 1349).

Dr. Zimmerman further observed that while Dr. Husar, seen on Plaintiff's last day of work in May 2012 and during the following month, recommended cognitive rehabilitation — and Dr. Craig echoed this — Plaintiff apparently did not seek such treatment until she had been out of work for almost two months. (LTD Cl. 1349).  Additionally, Dr. Zimmerman noted, while Plaintiff referenced flares occurring from October 2009 to January 2010, and from February to

June 2012, this suggested "the [second] flare started a few months before work stoppage and ended less than a month after [date of disability]," rendering suspect Plaintiff's claim of disability throughout the entirety of the elimination period.  (*Id.* at 1349-50).

With respect to Dr. Crago's toxic mold assessment, Dr. Zimmerman remarked that it "largely rested upon the assumption [that Plaintiff] had been exposed to toxic mold as she reported," though Dr. Zimmerman deferred further analysis on the substance of the alleged exposure to Dr. Charles Thurber, who would also review Plaintiff's claim on appeal.  (LTD Cl. 1350). Nonetheless, Dr. Zimmerman noted, Plaintiff's "report of toxic mold exposure [was] inconsistent among providers," given that (i) Plaintiff informed Dr. Moyer, in November 2012, that she was exposed around the time of onset of her symptoms, whereas (ii) Plaintiff did not tell Dr. Woodruff, in February 2013, about potential mold exposure.  (*Id.*).  Dr. Zimmerman further stated that Dr. Crago's analysis did not rest on any observation of Plaintiff, and his proffered research publications "did not document robust research designs," as study participants' effort, motivation, and truthfulness were not assessed.  (*Id.* at 1350-51).

Accordingly, Dr. Zimmerman concluded that (i) Plaintiff "misrepresented her medical history (including mold exposure and seizures) and symptoms (including cognitive) between providers"; (ii) her neuropsychological test data was "insufficient in scope to support a cognitive disorder"; and (iii) her results within and across examinations were "inconsistent with a physiological

pattern." (LTD Cl. 1351). Moreover, Plaintiff's rehabilitation history was sparse following her disability date, leading Dr. Zimmerman to conclude that "psychiatric impairment near [date of disability] (5/18/12) [ ] through end of the [elimination period] (11/16/12) was not consistently supported." (*Id.* at 1351).

Finally, internal medicine specialist Dr. Charles Thurber reviewed Plaintiff's file and appeal (LTD Cl. 1364-69), after which he concluded that (i) Plaintiff's "physical conditions were not impairing" around her date of disability, and (ii) there was not "evidence for an organic basis for her alleged cognitive impairment" (*id.* at 1367). While noting that Plaintiff "consistently reported cognitive memory problems and to a lesser extent headaches," Dr. Thurber noted that no etiology had been determined, and that Plaintiff's records did not "give additional information to support either diminished functional capacity or investigative/examination support for pathophysiological explanation for the various conditions that [Plaintiff] perceives as impairing." (*Id.* at 1367-68).

Moreover, Dr. Thurber noted, Plaintiff's demonstrated functional capacity was "at variance" with her reported symptoms; Dr. Thurber pointed to Plaintiff's ability to bike, walk, shop, drive, and move her daughter across the country. (LTD Cl. 1368). Dr. Thurber also echoed other reviewers' concerns regarding Plaintiff's inconsistent reports of the date of onset. (*Id.*).

With respect to the toxic mold issues, Dr. Thurber observed that, unlike her daughter, Plaintiff had "no history of typical respiratory symptoms"

correlating to toxic mold exposure, and he considered "[t]he connection between mold and cognitive disorder [ ] problematic and, therefore, of little significance to her impairment allegations." (LTD Cl. 1369). As Dr. Thurber noted, Plaintiff's treating physicians had not "engage[d] this as an idea that definitely could have remotely cause[d] her cognitive problems," even when informed by Plaintiff of her perceived link, and he deemed Dr. Crago's assertions unsubstantiated by clinical facts. (*Id.*).

### h.    Unum's Denial of Plaintiff's Appeal

On February 21, 2014, Unum issued its determination upholding its earlier decision to deny Plaintiff's long-term disability claim. (LTD Cl. 1373-81). As Unum explained, "impairment was not supported for any condition or combination of conditions from the date she stopped working, May 18, 2012, through the end of her elimination period (November 16, 2012)." (*Id.* at 1374).

With regard to Plaintiff's treatment prior to the end of the elimination period, Unum stated that Plaintiff's records "indicate[d] a long standing psychiatric history," given her 2009 prescriptions for Adderall and Xanax, along with her referral to Dr. Miric by a psychiatrist. (LTD Cl. 1374). Unum noted that Plaintiff only later began attributing her symptoms to a physical, rather than a psychiatric, cause; even then, while she visited a number of neurologists and neuropsychologists for "extensive cognitive work up[s]," no etiology was determined. (*Id.*). As Unum also observed multiple times in its determination, while Plaintiff reported suffering work performance, correspondence with her employer contradicted this. (*Id.*; *see also id.* at 1376).

Unum further referenced Plaintiff's re-evaluation by Dr. Craig, which noted improvements in certain cognitive domains, alongside worsening of others.  (LTD Cl. 1375).  And though Dr. Craig and Dr. Husar recommended cognitive rehabilitation, Plaintiff "did not seek symptom relief/treatment for her cognitive or psychiatric symptoms until she had been out of work almost two months," other than visiting Dr. Linehan — from whom she sought a diagnosis rather than rehabilitation, based on a referral from Time Warner's Employee Assistance Program.  (*Id.*).

Unum then discussed Plaintiff's move from New Jersey to Arizona, along with her "telephone contact with the disability benefits specialist [during which she] indicated she was trying to coordinate going to a clinic in Arizona and working with her insurance company."  (LTD Cl. 1375).  According to Unum, this "indicate[d] capacity for higher level critical thinking, problem solving, follow through, focus and attention to detail."  (*Id.*).  With respect to Dr. Moyer's neuropsychological evaluation, Unum stated that this "assessment did not document a sufficient or valid evaluation of cognitive abilities and personality/psychiatric status."  (*Id.* at 1376).

Next, Unum assessed Plaintiff's records post-dating the elimination period, first noting that while Plaintiff attributed her symptoms to black mold while meeting with Dr. Brighton on February 19, 2013, she did not mention black mold to Dr. Woodruff one week later.  (LTD Cl. 1376).  Further, while Dr. Meyer referenced "observed memory, word finding and other unspecified cognitive difficulties during sessions," Plaintiff's employer refuted any alleged

performance problems, and Plaintiff's neuropsychological testing "did not validate consistent evidence of cognitive impairment."  (*Id.*).

Unum then addressed Dr. Crago's analysis — which, as noted, was based only on medical reports and insurance documentation — noting that his opinion "rested upon the assumption that [Plaintiff] had been exposed to toxic mold as she reported," an idea with which Plaintiff's treating physicians had not engaged.  (LTD Cl. 1377).  In its medical conclusion section, the Unum determination indicated that *no* etiology for Plaintiff's cognitive conditions had been identified, and her records, "including normal neurological examinations[,] [did] not support diminished functional capacity or the various conditions [Plaintiff] report[ed]."  (*Id.*).  As the denial letter indicated, "[Plaintiff's] reports of impaired function [were] not supported by the available medical evidence or her known activities," and accordingly, Plaintiff was "not limited from performing the material and substantial duties of her regular occupation as of May 18, 2012."  (*Id.* at 1378).

### 3.    The Instant Action

On March 12, 2014, Plaintiff filed the instant matter in the District of Arizona (Dkt. #1), and on September 23, 2014, the case was transferred to this Court (Dkt. #61).  On November 3, 2014, Plaintiff filed an Amended Complaint (Dkt. #69), which Defendants answered on December 19, 2014 (Dkt. #84).  While the parties ultimately resolved Plaintiff's short-term disability claim prior to dispositive motion practice (*see* Dkt. #105), the parties opted to proceed to the instant bench trial on the stipulated record, under Rule 52, for Plaintiff's

long-term disability claim.  Plaintiff filed her opening trial memorandum on

November 24, 2015 (Dkt. #110), and Defendants filed their opening

memorandum and opposition on January 12, 2016 (Dkt. #113).  Plaintiff then

filed her opposition and reply on February 18, 2016 (Dkt. #115), to which

Defendants replied on March 2, 2016 (Dkt. #118), concluding briefing on the

Rule 52 motion.

**B.    The Court's Conclusions of Law**

    **1.    The Standard of Review**

"Judicial review of a plan administrator's underlying benefits

determination is reviewed *de novo* unless … the plan grants the administrator

discretionary authority to determine eligibility for benefits or to construe the

terms of the plan."  *Miles* v. *Principal Life Ins. Co.*, 720 F.3d 472, 485 (2d Cir.

2013) (citing *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989)).

Where a plan affords the administrator "broad discretionary authority to

determine eligibility," such benefits determinations "are reviewed under the

arbitrary and capricious standard."  *Celardo* v. *GNY Auto. Dealers Health &*

*Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003).  Under this standard, "a court

may not overturn the administrator's denial of benefits unless its actions are

found to be arbitrary and capricious, meaning 'without reason, unsupported by

substantial evidence or erroneous as a matter of law.'"  *McCauley* v. *First Unum*

*Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (citing *Pagan* v. *NYNEX Pension*

*Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  In this setting, "[s]ubstantial evidence

is 'such evidence that a reasonable mind might accept as adequate to support

the conclusion reached by the [administrator and] … requires more than a scintilla but less than a preponderance." *Celardo*, 318 F.3d at 146 (quoting *Miller* v. *United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995)).

However, while an administrator receives great deference where granted discretionary authority, a court may take into consideration whether, as argued here, "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." *Bruch*, 489 U.S. at 115. Specifically, as the Supreme Court has described, "[o]ften the entity that administers the [benefits] plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," which the Supreme Court deems a categorical conflict of interest. *Metro. Life Ins. Co.* v. *Glenn*, 554 U.S. 105, 108 (2008). In the event of such a conflict of interest, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and [ ] the significance of the factor will depend on the circumstances of the particular case." *Id.*

Explaining further, the *Glenn* Court clarified that such conflict would not require *de novo* review; rather, trust law — which guides evaluations of plan administrators — would "continue[] to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Glenn*, 554 U.S. at 111, 115. The Court declined to prescribe particular

burdens of proof or evidentiary rules, noting instead that judges should consider the conflict as one "factor," and "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."  *Id.* at 117.

As the Court noted, the conflict of interest factor "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company has a history of biased claims administration."  *Glenn*, 554 U.S. at 117.  In contrast, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy," which could consist of "walling off claims administrators from those interested in firm finances, or [ ] imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Id.*

As the Second Circuit later held, in light of *Glenn*, "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate."  *McCauley*, 551 F.3d at 133.  Moreover, "[t]his is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation" of the terms of the plan.  *Id.*; *see also Durakovic* v. *Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) ("The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood

that the conflict affected the benefits decision." (internal citation and alteration omitted)).

### 2. The Court Has Considered Unum's Conflict of Interest in Rendering Its Conclusions of Law

Here, it is undisputed that Unum was granted discretionary authority under the terms of the Plan to determine eligibility for benefits.  (*See* LTD Plan 45 ("The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan.")).  Plaintiff argues, however, that Defendant Unum faces a *Glenn*-type structural conflict of interest, as it both evaluates the claims of insured Time Warner employees and ultimately pays long-term disability benefits, following Time Warner's payment of the first two years of disability.  (Pl. Br. 35).  In contrast, Unum contends that there is, in fact, no conflict of interest, as Time Warner is obligated to pay the first 24 months of Plaintiff's disability benefits.  (Def. Br. 33).  As Unum notes, the Plan caps disability benefits for claims "primarily based on self-reported symptoms, and disabilities due to mental illness" at that 24-month mark, requiring further evaluations at that time prior to continuing benefits.  (*Id.* (citing LTD Plan 26)).  Accordingly, Defendants suggest Plaintiff's claim, if approved, would be cut off at 24 months, and Unum would not be obligated to pay anything absent re-approval of her claim at that time.

Plaintiff has the better of this argument.  As discussed above, Plaintiff claimed benefits for "her ongoing disability due to an organic/physical cognitive disorder," rather than seeking a determination under the provision for self-

reported or mental illness-based symptoms.  (*See supra* at 46-47).  While
Unum may have believed Plaintiff's claims were more appropriately categorized
under those umbrellas, its determination was made according to Plaintiff's
theory of a physically based-condition, which — if approved — would have
yielded benefits beyond the two-year mark.  Accordingly, Unum may not now
absolve itself of the conflict of interest that inheres in its duty to pay benefits
beyond the 24-month time period.

Beyond this, Plaintiff places great weight on Unum's conflict of interest,
arguing that it is exacerbated by Unum's history of biased claims handling and
by Unum's incentive structure.  (Pl. Br. 35-41).  Plaintiff points to cases within
the Supreme Court and the Second Circuit referencing Unum's oft-criticized
history of "abusive tactics," and further contends that Unum's incentive
structure "invites a substantial risk that the personnel involved in [Plaintiff's]
claim would engage in the very conduct criticized by various courts."  (*Id.* at
40-41).  Thus, Plaintiff argues, this Court should "give Unum's conflict
substantial weight" in evaluating the denial of Plaintiff's claim.  (*Id.* at 41).

In response to Plaintiff's contention that Unum has a biased history with
respect to claims administration, Unum states that the decisions cited by
Plaintiff are "not evidence, and courts will not automatically assume that
Unum has a biased history."  (Def. Br. 37).  However, Defendants cite for this
proposition *St. Onge* v. *Unum Life Ins. Co. of Am.*, 559 F. App'x 28, 31 (2d Cir.
2014) (summary order), in which the plaintiff "put forth no evidence that Unum
'has a history of biased claims administration.'"  Here, in contrast, Plaintiff has

put forth a number of documents that, she alleges, demonstrate Unum's bias. In addition, the Second Circuit's earlier decision in *McCauley* speaks directly to Unum's controversial past:

> First Unum is no stranger to the courts, where its conduct has drawn biting criticism from judges…. Also, First Unum's unscrupulous tactics have been the subject of news pieces on "60 Minutes" and "Dateline," that included harsh words for the company…. In light of First Unum's well-documented history of abusive tactics, and in the absence of any argument by First Unum showing that it has changed its internal procedures in response, we follow the Supreme Court's instruction and emphasize this factor here.

551 F.3d at 137. As well, Plaintiff here introduces a number of exhibits concerning Unum's purportedly biased claims history and its incentive structure, in order to persuade this Court that it should factor Unum's structural conflict of interest more heavily into its evaluation of Unum's determination.

With regard to the extra-record exhibits introduced by Plaintiff, "[g]enerally, a court's review of an ERISA claim under the arbitrary and capricious standard is limited to evidence in the administrative record, but the court does have discretion to admit evidence outside the record upon a showing of 'good cause.'" *Puri* v. *Hartford Life & Accident Ins. Co.*, 784 F. Supp. 2d 103, 105 (D. Conn. 2011) (citing *Krauss* v. *Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008); *Locher* v. *UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 293-94 (2d Cir. 2004)). "Although a Defendant's demonstrated conflict of interest may be an example of good cause, a conflicted administrator does not

*per se* constitute good cause." *Wedge* v. *Shawmut Design & Constr. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 337 (S.D.N.Y. 2014) (internal citation omitted). "The application of such a *per se* rule would improperly 'allow additional evidence to be presented at the district court level in almost every circumstance on the basis of a presumed conflict of interest' and 'eliminate the appropriate incentive for a claimant to submit all available evidence regarding the claimant's condition to the insurance company upon first submitting a claim.'" *S.M.* v. *Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 506 (S.D.N.Y. 2015) (quoting *Locher*, 389 F.3d at 295), *aff'd*, 644 F. App'x 81 (2d Cir. 2016) (summary order). When presented with extra-record evidence, "District Courts have emphasized a plaintiff's burden to allege facts, with sufficient specificity, that would support the existence of 'good cause' permitting the admission of additional evidence beyond the administrative record." *Krizek* v. *Cigna Grp. Ins.*, 345 F.3d 91, 98 n.2 (2d Cir. 2003).

Plaintiff presents a number of documents outside of the short- and long-term disability claims (and apart from the Plan itself), including:

    (i)    An excerpt from the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition ("DSM-IV") (Pl. Ex. 1);

    (ii)    A "Report of the Targeted Multistate Market Conduct Examination," dated November 18, 2004, reviewing the claims-related conduct of a number of insurance companies, including Unum (Pl. Ex. 2);

(iii)   A document labeled "The Benefits Center Claims Manual" and titled "Medical Peer-to-Peer Contact" (Pl. Ex. 3);[21]

(iv)   A National Academy of Neuropsychology ("NAN") position paper regarding "symptom validity assessment" (Pl. Ex. 4);

(v)   A letter from Dr. Robert Crago, post-dating Unum's determination to uphold its denial of benefits on appeal (Pl. Ex. 5);

(vi)   Documents relating to Unum's compensation program and Annual Incentive Plan (Pl. Ex. 6-7, 18);

(vii)   Documents detailing Unum's internal method of tracking new, pending, and closed benefits claims (Pl. Ex. 8-11, 19);

(viii)   A NAN "position statement" regarding conflicts of interest involved in contingency fee arrangements (Pl. Ex. 12);

(ix)   Various portions of the transcript from the parties' pre-motion conference in this case (Pl. Ex. 13, 15 (Dkt. #91));

(x)   A one-page excerpt from a deposition of a Unum director in a matter in the District of Arizona pertaining to quarterly conferences with "benefits center personnel" that included a financial overview of the company (Pl. Ex. 14);

(xi)   Two redacted letters from Unum to claimants in other matters requesting evaluation reports, treatment notes, raw data, and other information (Pl. Ex. 16-17); and

(xii)   An internal memorandum (within then-Provident Life and Casualty Insurance Company) from April 1995 regarding benefit claims and company financial reserves (Pl. Ex. 20).

At the outset, the Court notes that Defendants challenge only Exhibits 1, 4, and 5, contending that Plaintiff has not established "good cause" for their

---

[21]   While Plaintiff asserts — and Defendants do not appear to contest — that this is a Unum document, the Court observes that nothing on the face of the document indicates that it pertains to Unum's own claims resolution process.

introduction into the record.  With regard to Exhibit 1, the Court notes that

such information presumably would have been available to or known by the

claims administrator.  Moreover, courts in this Circuit regularly consult and

cite commonly-known medical sources like the DSM.  *See, e.g., Critchlow* v.

*First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 263-64 (2d Cir. 2004).

Accordingly, the Court will consider Exhibit 1.

     With respect to Exhibit 4, the Court finds that Plaintiff has failed to

establish good cause for its introduction, as NAN's position on symptom

validity assessment is neither controlling nor persuasive authority for the

Court's determination; while Plaintiff challenges Unum's assessment of her

own physicians' validity testing, she has not "allege[d] facts, with sufficient

specificity, that would support" admission of NAN's position as evidence in this

case.  *S.M.*, 94 F. Supp. 2d at 506.  And, with regard to Exhibit 5, Dr. Crago's

post-appeal submission, the Court finds this "introduction of [ ] extra-record

evidence to challenge an administrator's substantive determination [ ] not

appropriate."  *Wedge*, 23 F. Supp. 3d at 337 (internal citation omitted).  This

case-specific information was not before the claims administrator at the time it

made its determination on appeal, and it does not speak to Unum's potential

for a biased assessment; rather, it only introduces new arguments to contest

Unum's determination on appeal, and thus, it should not play a role in this

Court's assessment of whether that determination was arbitrary and

capricious.

As Defendants have not, however, challenged the documents pertaining to Unum's claims review process and its incentive structure, the Court has considered them in assessing the weight of the role Unum's conflict should play in this matter.  Moreover, Plaintiff has alleged specific facts supporting good cause for consideration, including her contention that the terms of Unum's Performance Based Initiative ("PBI") program provide bonuses of up to 25% for the claims reviewers involved in Plaintiffs case; beyond that, Plaintiff claims that Unum's method of tracking claims management inappropriately incentivizes employees to deny disability claims in order to bolster Unum's reserves, improve its financial performance, and concomitantly increase their bonuses.  (*See* Pl. Br. 37-39).  Accordingly, as noted, the Court has considered the additional exhibits submitted by Plaintiff.

Included among these documents is a "Report of the Targeted Multistate Market Conduct Examination," published in 2004 by the Maine Bureau of Insurance, Massachusetts Division of Insurance, Tennessee Department of Commerce and Insurance, and a number of other jurisdictions; the report evaluated Unum and its related companies Paul Revere and Provident, finding that they were engaged in a number of abusive claims procedures, including: (i) "[e]xcessive reliance upon in-house medical professionals"; (ii) "[u]nfair construction of attending physician or IME reports"; (iii) "[f]ailure to evaluate the totality of [a] claimant's medical condition"; and (iv) "[i]nappropriate burden placed on claimants to justify eligibility for benefits."  (Pl. Ex. 2).  From this, in conjunction with cited cases within this Circuit excoriating Unum for their

procedures, the Court finds that Plaintiff has adequately demonstrated Unum's history of biased procedures, which the Court has taken into account in evaluating Unum's review here.  However, the Court notes that Defendants have presented a counter-example from the Maine Bureau of Insurance, dated April 15, 2008, which quotes the Maine Insurance Superintendent as stating, in the wake of the above-referenced regulatory review, that Unum provided an example of "an insurer reforming its practices and becoming a model for other insurers," including "strong new processes and [a] resulting change in corporate culture."  (Def. Ex. A).  The Court determines that there is good cause to admit this document as well, as it speaks to the same issues raised by Plaintiff in her extra-record submissions.  Thus, while the Court has considered Unum's biased history of claims processing, it has also taken into account that at least one regulator has found Unum to have ameliorated its prior abusive tactics.

With respect to Plaintiff's presentation of documents pertaining to Unum's incentive structure and claims tracking and processing methodologies, the Court finds these to constitute evidence that Unum has failed to "wall[] off" its claims personnel from firm finances, a factor cited as "reduc[ing] potential bias" by the *Glenn* Court.  *See Glenn*, 554 U.S. at 117.  However, the Court does not accept this proffered evidence to mean that Unum allows its processors to observe firm finances (e.g*.,* by permitting a company stock ticker to remain on the home page of their computers) in a manner intended to incentivize them to deny claims.  As Defendants argue, "very few companies

68

would continue to exist, decade after decade (as Unum has), if its business model was to cheat its customers and their employees." (Def. Br. 36). The Court acknowledges the alternative position, as the *Glenn* Court did, that "[a]n employer choosing an administrator in effect buys insurance for others and consequently (when compared to the marketplace customer who buys for himself) may be more interested in an insurance company with low rates than in one with accurate claims processing." 554 U.S. at 114. Thus, one could surmise that an insurance company would reject more claims to improve its own reserves and accordingly offer more competitive rates. Again, as with Unum's history of biased claims review, the Court has considered this evidence presented by Plaintiff as a factor in its evaluation of Unum's decision here.

As a result, while the Court evaluates Unum's decision under the arbitrary and capricious standard, it has — as required under *Glenn* and *McCauley* — undertaken a more probing review of the record to determine whether there is any indication that Unum's structural conflict or incentive program has motivated its decision in Plaintiff's case. Following this review, the Court has determined that despite its structural conflict of interest, Unum's determination was not arbitrary and capricious, and there is no indication that any conflict of interest impacted its determination in Plaintiff's case. The Court's conclusion is reflected more fully below in its analysis of Unum's "full and fair review," including Unum's thorough engagement with Plaintiff's medical records and its defensible and articulated conclusions from those records.

69

### 3.     Plaintiff Received a Full and Fair Review

At base, Plaintiff claims that she was denied a full and fair review of her long-term disability benefits claim because Unum's reviewers "disregarded" her attending physicians' findings that she was disabled and improperly seized on alleged inconsistencies in the record to deny her claim.  (*See generally* Pl. Br. 21-35).  In contrast, after reviewing the medical records discussed in detail above, the Court finds that Unum's determination was *not* "without reason, unsupported by substantial evidence or erroneous as a matter of law," *Celardo*, 318 F.3d at 146 (internal citation omitted), even taking into account Unum's structural conflict and the incentive-related documents presented by Plaintiff. The Court observes that Plaintiff's file was reviewed at least 13 times by three nurses and seven different doctors.  Although Plaintiff points out that all of these reviewers were "eligible for bonuses under Unum's Performance Based Incentive (PBI) compensation program" (*see* Pl. Br. 37-38), as discussed above, this is but one factor in the Court's assessment of Unum's full evaluation. Moreover, as discussed in greater detail below, Unum acknowledged and thoroughly evaluated the records from Plaintiff's treating physicians, in addition to Plaintiff's subjective complaints, before denying her claim.

### a.     Unum's Requirement that Plaintiff Demonstrate the Cause of Her Disability Was Not Arbitrary and Capricious

In their opening and opposition brief, Defendants contend that Plaintiff failed, under the terms of the Plan, to submit proof of the cause of her disability, and instead "assert[ed] merely that she was disabled due to alleged cognitive dysfunction, without pointing to compelling medical, psychological or

neuropsychological evidence that she had a sickness or injury capable of causing that dysfunction." (Def. Br. 5). In reply, Plaintiff asserts that she was not obligated to demonstrate the etiology of her cognitive dysfunction, but rather needed only to demonstrate that she was "limited from performing the material and substantial duties of [her] regular occupation due to sickness or injury." (Pl. Reply 2 (citing LTD Plan 18)).

Plaintiff relies in part on *Dimopoulou* v. *First Unum Life Ins. Co.*, No. 13 Civ. 7159 (ALC), 2016 WL 612890, at *6 (S.D.N.Y. Jan. 26, 2016), which deemed Unum's "narrow focus" on a claimant's "inability to meet diagnostic criteria for the specific illnesses" claimed (namely, CFS and fibromyalgia) to be arbitrary and capricious; as the court there determined, the long-term disability plan at issue "define[d] 'disability' not in terms of satisfaction of specific diagnostic criteria, but rather in terms of the performance limits one faces in her occupation due to any sickness or injury."

Significantly, however, *Dimopoulou* did not discuss whether the plan at issue, through a different employer than Time Warner, required proof of the cause of the cited disability, which is listed as a requirement for the proof of claim in the Plan here. (*See* LTD Plan 8 (specifying that proof of claim "must show … the cause of your disability")). And while *Dimopoulou* may present, at first glance, a persuasive case for disregarding all terms apart from the definition of disability, the Court ultimately concurs with Defendants' contention that Plaintiff was required to submit "competent proof of a cause for her alleged cognitive dysfunction." (Def. Br. 28).

71

As the Second Circuit has determined, an administrator "act[s] within its discretion in requiring some objective evidence that [the claimant] was disabled from performing in a sedentary capacity," particularly where (i) Unum informed Plaintiff that no submitted documentation had substantiated the criteria involved in her diagnosis; and (ii) a requirement of objective medical evidence was "not contradicted by any provision of [the administrator's] own policy, which provide[d] that an employee's claim may be denied if she cannot 'obtain sufficient medical evidence to support' her disability claim." *Hobson* v. *Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009); *see also Fitzpatrick* v. *Bayer Corp.*, No. 04 Civ. 5134 (RJS), 2008 WL 169318, at *10 (S.D.N.Y. Jan. 17, 2008) ("[S]everal courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." (collecting cases)); *cf. Maniatty* v. *Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("While plaintiff argues that the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that 'proof' of continued disability must be provided, and the very concept of proof connotes objectivity." (internal citation omitted)), *aff'd*, 62 F. App'x 413 (2d Cir. 2003) (summary order).

Here, the Court concurs in the necessity for objective medical evidence beyond the assertions of Plaintiff's physicians.  As discussed in greater detail below, the Court has determined that Unum's discounting of Dr. Crago's conclusion — that Plaintiff's condition was caused by exposure to toxic

72

mold — was not arbitrary or capricious.  Apart from that assertion on appeal (and Dr. Moyer's follow-on conclusion), the consensus among Plaintiff's treating professionals was that she suffered from cognitive dysfunction of unknown etiology.  Indeed, a number of doctors sourced Plaintiff's symptoms to psychological conditions, such as anxiety and depression, including Dr. Mintz (*see* LTD Cl. 128-31), Dr. Cramer (*see id.* at 108), Dr. Moyer (*see id.* at 120-21), and Dr. Narasimhan (*see id.* at 149; *see also id.* at 1029 ("She has memory problems secondary to depression/cognitive dysfunction as evidenced in neuropsychology evaluation.")).  Further, certain other treating doctors, such as Dr. Meyer, diagnosed depressive or anxiety-related symptoms, but assessed these to be a consequence of Plaintiff's cognitive issues, rather than a cause. *See supra* at 16-18.

As described above, the Plan provides a 24-month benefit cap for disability based primarily on self-reported symptoms or mental illness; mental illness, in turn, explicitly includes depression, anxiety, and adjustment disorders.  (LTD Plan 26, 37).  Although no party to this case has plainly stated it, it is clear to the Court that Plaintiff pursued a claim for benefits based on cognitive dysfunction of an organic or physical etiology *with the objective of* obtaining benefits beyond two years; in this vein, the Court cannot discount the probability that Plaintiff might have obtained — but would not have been satisfied with — a diagnosis of cognitive dysfunction based on "a psychiatric or psychological condition."  (*Id.* at 37).  Instead, Plaintiff repeatedly underwent testing and visited doctors searching for a physical etiology for her

73

symptoms — going so far as to craft different timelines of her symptomatology for different doctors — but her doctors were unable to determine such a cause.

In its benefits denial letter, Unum cited a number of reasons, including the facts that:

> By at least 2009 [Plaintiff] [re]attributed her symptoms from psychiatric to a medical/physical cause. She engaged in a several year series of specialty evaluations before and after she stopped work in May 2012. In pursuit of a medical explanation for her symptoms she saw four neurologists and two neuropsychologists, as well as numerous other traditional and alternative medicine specialists between 2009-2013. There has been extensive cognitive work up; however, no significant findings were noted on multiple clinical exams and diagnostic testing to explain the presence and severity of [Plaintiff's] reported symptoms.

(LTD Cl. 1374). As such, Plaintiff was sufficiently informed by Unum's denial letter of the inadequate physical evidence supporting her claim, and Plaintiff's current claim that Unum "did not raise etiology as a basis for denying [Plaintiff's] claim … [and] therefore waived that alleged defense" (*see* Pl. Reply 2), is simply wrong.

Given the interplay between disabilities of a physical origin and those based on self-reported symptoms or mental illness, in conjunction with Plaintiff's assertion that she was disabled due to a cognitive disorder of an "organic" or physical origin, the Court understands Unum's inclusion of this "cause" requirement to be a safeguard against circumvention of the two-year cap on self-reported symptoms. This case is therefore distinguishable from a matter like *Magee* v. *Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 317-18 (S.D.N.Y. 2009), in which the court found an insurance company unreasonable for

74

demanding objective evidence of a disabling impairment (CFS) where common medical knowledge dictated that the symptoms were entirely subjective.  Here, no party has contended that Unum is demanding objective proof of a purely subjective condition; on the contrary, Plaintiff has resisted the conclusion that her illness is characterized only by self-reported symptoms.

Further, Unum was not required to accept at face value the assertion of Dr. Craig that Plaintiff's "file [was] replete with information confirming her ongoing disability due to an organic/physical cognitive disorder" (LTD Cl. 1235), when no doctor had been able to obtain evidence supporting such a claim.  *See Hobson*, 574 F.3d at 88 ("[I]t is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."); *cf. Maniatty*, 218 F. Supp. 2d at 504 ("[F]ar from ignoring the reports of the treating physicians, [the administrator] heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints. In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.").  Accordingly, the Court finds that it was not arbitrary and capricious for Unum to determine that Plaintiff's failure to present a physical etiology was one ground on which to deny her claim.

### b. Unum's Interpretation of Plaintiff's Records Was Appropriate

While Plaintiff contends that Unum cherry-picked among Plaintiff's records and relied on negative interpretations of those records to support a denial of benefits, the Court disagrees.  As noted, Plaintiff's claim was reviewed more than a dozen times by approximately ten different claims reviewers.  Comparing its own review of Plaintiff's wealth of medical evidence to Unum's assessments, the Court finds that Unum's reviewers delved deeply into the records supplied by Plaintiff's treating physicians, and did not neglect to consider the portions of those records supporting Plaintiff's disability claim — most often, her attending physicians' assertions that she had severe cognitive dysfunction precluding her continued employment.  The fact that Unum identified discrepancies in Plaintiff's reported medical history that supported its denial, while declining to take at face-value her physicians' assertions of cognitive dysfunction, does not equate to cherry-picking among her records, and does not render Unum's decision arbitrary and capricious. *See Black & Decker Disability Plan* v. *Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

The Court also accepts, as a general proposition, the importance of considering a plaintiff's subjective complaints before denying a claim. *See, e.g., Miles* v. *Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) ("[A] reviewing

court is obliged to determine whether a plan administrator has given sufficient attention to the claimant's subjective complaints … before determining that they were not supported by objective evidence." (internal citation and alteration omitted)).  The *Miles* Court observed that a plan administrator should "provide specific reasons for its decision to discount" such complaints, in order for a court to find they were given sufficient attention.  *Id.* at 487.  Here, as discussed below, Unum detailed a number of reasons for finding Plaintiff's subjective complaints non-credible, many of which were attributable to the inconsistencies in the accounts Plaintiff provided over time and among physicians.

For example, Unum reasonably considered Plaintiff's fluctuant accounts as to the timing of the onset of her symptoms, varying from five years prior to her visit with Dr. Miric in October 2009 (LTD Cl. 341), to only three years prior to her visit with Dr. Moyer in November 2012 (*id.* at 114-15).  Compounding this, Plaintiff later adopted an account attributing her difficulties to toxic mold exposure in 2009, highlighting the inconsistency of her comments *in 2009* that the relevant symptoms had begun years earlier.  Further, Unum justifiably considered the gaps in Plaintiff's treatment during the elimination period (*id.* at 995), along with the two-month gap between the beginning of her disability leave and her first treatment as directed by Dr. Husar and Dr. Craig (*id.* at 1349), as evidence that Plaintiff was not as severely disabled as she claimed.

Along the same lines, Plaintiff's dire accounts of her difficulties at work — informing Dr. Craig in 2009 that her difficulties were "very evident" at

work (LTD Cl. 86), telling Dr. Craig in 2012 that she would likely be "let go" for performance issues (*id.* at 94), and reporting to Dr. Husar that she received "an ultimatum" to get help or be fired (*id.* at 83) — contradicted her supervisor's report that while he noticed a decline in her energy and health, he had issued no warnings and reported no performance issues (*see* STD Cl. 140).

Moreover, while Plaintiff repeatedly criticizes Unum's comments about her planning and execution of a cross-country move, which Unum deemed incompatible with severe cognitive dysfunction (*see* Pl. Br. 19-20, 23), Unum's consideration of this factor was not an abuse of its discretion under the Plan. While Plaintiff argues that her "17-year-old son [ ] moved to Arizona to help her" (LTD Cl. 793), Plaintiff does not indicate that her son had in fact helped her plan and undertake the cross-country move itself, which Unum believed would be cognitively challenging and at odds with Plaintiff's claimed level of functioning.  Thus, consideration of this factor among many others in finding that Plaintiff's activities contradicted her claimed cognitive deficits did not amount to an abuse of discretion.

Relatedly, Plaintiff criticizes Unum for "[r]ejecting without explanation the findings of Drs. Linehan, Meyer, and Moyer that [Plaintiff's] GAF score always hovered in the severely restricted 40-50 range."  (Pl. Br. 41).  Defendants, in reply, state that "Unum fully evaluated the records and reports of those doctors," and determined either that they were not credible or that the reported low GAF score was at odds with Plaintiff's day-to-day functioning.  (Def. Reply 7-8).  The Court concurs with Defendants' reasoning.  Notably, Plaintiff's

lowest recorded GAF score was 40, which indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." (*See* Pl. Ex. 1). Unum could reasonably determine that this was at odds with Plaintiff's account to Dr. Linehan, as she represented to him that she was able to take care of her daughter, while noting that her boyfriend in Florida was "useless" and her family living locally did not provide support. (*See* LTD Cl. 609-11).[22]

The Court also considers the critiques of Dr. Craig's and Dr. Moyer's symptom validity assessments. With regard to Dr. Craig's testing, the Court takes Unum's point that his methodology was in turn criticized by Dr. Moyer, who definitively would not be impacted by any potential conflict of interest or bias; Dr. Moyer's critique thus lends credibility to Unum's criticisms of Dr. Craig's testing, which purportedly did not incorporate symptom validity testing. With respect to Unum's criticism of Dr. Moyer's testing, the Court notes that multiple Unum reviewers suggested her methodology was dated or ineffective, and critiqued her finding of validity where Plaintiff failed certain portions of the test. (*See, e.g.,* LTD 415-18 (Dr. Black); *id.* at 1064 (Dr. Spica)). Further, Defendants correctly observe that Dr. Moyer attributed "special significance to the fact that the patient unhesitatingly reported the onset of her

---

[22]   In any event, the Court notes that a low GAF score alone would not suffice to demonstrate Plaintiff's claimed disability. As noted above, Plaintiff maintains that she has an organically- or physically-based condition, and her GAF score would not reflect the etiology of her deficits.

cognitive/physical difficulties during a time period when she had possible exposure to toxic mold" (LTD Cl. 120), yet Plaintiff had reported varying times of onset to her physicians, rendering less persuasive Dr. Moyer's finding of credibility on this ground.  Accordingly, the Court finds it was not an abuse of discretion for Unum's reviewers to ascribe less weight or credibility to Dr. Moyer's testing.

Further, Plaintiff notes that Unum's independent investigator, Linda Moses, observed Plaintiff and noted her halted speech and apparent struggles to recall certain words; as Plaintiff argues, Unum then ignored Moses's findings and Moses's failure to cite any "inconsistencies" in Plaintiff's presentation.  (Pl. Br. 19-21, 41).  As Defendants argue in reply, a number of Unum reviewers considered and cited Moses's evaluation, and her report is but "one data point, regarding a layperson's observations of [P]laintiff, at [a] single meeting held at her disability lawyer's office, several months after the Elimination Period ended." (Def. Reply 9).  Moreover, as the Court observes, Moses's report does not indicate that she reviewed any of Plaintiff's prior medical records or any of Unum's assessments, nor that she conducted any cognitive testing or validity assessments, thus giving her little baseline against which to determine "inconsistencies."

Setting aside Plaintiff's account of her symptoms and activities, Unum further relied on Plaintiff's inconsistent test results among providers as grounds for denying her claim.  For example, Plaintiff's cognitive testing with Dr. Moyer established that while Plaintiff had average scores for short-term

memory, her scores for long-term memory were low-average to borderline (LTD
Cl. 117-18); in contrast, Plaintiff's testing with Dr. Craig revealed "better ability
to recall 'long term' information" with "deficits across most areas of verbal and
non-verbal recall and manipulation of stimuli in short-term/working memory"
(*id.* at 93). Further supporting its conclusion, Unum understandably
questioned whether the cited scores in a "low average" range sufficed to
demonstrate that Plaintiff was fully disabled. (*See, e.g.*, *id.* at 416).

### c. Unum's Claims Procedures Did Not Render Its Determination Arbitrary and Capricious

A separate challenge to Unum's review process is Plaintiff's claim that
Unum employs an inappropriate "feedback loop claims approach." (Pl. Br. 17).
As Plaintiff argues, "[a]n insurer's bias is [ ] evident when it sets up a 'feedback
loop' approach in which reviewing employee-physicians reinforce their findings
with their previous opinions or the opinions of other employee-physicians who
agreed with them." (*Id.*). However, Plaintiff cites no law on this point, apart
from two cases in which the same claims reviewer evaluated a file twice and
concurred with his or her own earlier findings. With regard to Unum's claims
personnel reviewing the findings of their colleagues, Plaintiff presents no
precedent, nor has the Court identified any, suggesting this is an abuse of
discretion.

Plaintiff further alleges that allowing certain physicians to review
Plaintiff's evidence at the appeal stage, when those doctors had already
conducted assessments at the preliminary determination stage, precluded a
"full and fair review." (*See* Pl. Br. 17). Under 29 C.F.R. § 2560.503-1(h)(3)(v),

an appeal of an adverse benefits determination should be assessed by "an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual."

Based on the record, Dr. Zimmerman consulted on Plaintiff's short-term disability claim in March 2013, and then examined Plaintiff's long-term disability claim almost a year later following Plaintiff's appeal.  However, at the appeal stage, Dr. Zimmerman deferred analysis of the key additional evidence — Dr. Crago's assessment and Plaintiff's claim of toxic mold etiology — to Dr. Thurber, an internal medicine specialist who had not previously been involved in Plaintiff's claim determination process.  Moreover, Dr. Thurber's notes do not indicate, in his list of sources consulted, that he reviewed Dr. Zimmerman's conclusions from either the initial determination stage or following Plaintiff's appeal.  (LTD Cl. 1364-65).  Accordingly, while Dr. Zimmerman apparently reassessed Plaintiff's claim on appeal, the Court finds that Dr. Thurber independently reviewed the claim and provided a substantially similar conclusion.[23]  Thus, any error by Unum in permitting Dr.

---

[23]    Separately, the Court notes that Plaintiff cites only one case within this Circuit on this point, *Spears* v. *Liberty Life Assur. Co. of Boston*, No. 3:11-cv-1807 (VLB), 2015 WL 1505844, at *32 (D. Conn. Mar. 31, 2015).  There, notably, the plaintiff's appeal records included a letter from an Assistant Attorney General of the State of Connecticut, which was "highly critical" of the determining physician's initial report.  *Id.*  As the court there noted, it was "nearly inconceivable that a consultant whose analysis and conclusion ha[d] been called into question by a state prosecutorial office would do anything other than defend that conclusion[.]"  *Id.*  Such a pressured situation is not applicable here, where the only additional submissions came from two psychologists.

Zimmerman to review Plaintiff's long-term claim on appeal was ultimately harmless.

In the same vein, Plaintiff suggests that Unum utilized its "Roundtable" meetings for the purpose of closing out Plaintiff's claim without payment, citing two cases from outside this Circuit to support that contention.  (Pl. Br. 20; *see also Leavey* v. *Unum Provident Corp.*, 295 F. App'x 255, 258 (9th Cir. 2008) (referencing a roundtable review, "the sole purpose of which was to close expensive claims"); *Saldi* v. *Paul Revere Life Ins. Co.*, 224 F.R.D. 169, 179 (E.D. Pa. 2004) (referencing a claimant's assertion regarding the same)).  In opposition, Defendants claim Roundtables amount only to "a meeting of people with different specialties ... to discuss a claim and decide on next steps." (Def. Br. 40).  Defendants cite another case from outside this Circuit stating that "Unum asserts that it uses the reviews to assist disability benefits decision-makers in understanding medical aspects of the claims....  Plaintiff has not demonstrated that Unum used the round-table reviews in this case to eliminate expensive claims."  *Meyer* v. *UNUM Life Ins. Co. of Am.*, 96 F. Supp. 3d 1234, 1247 (D. Kan. 2015).  The Court concurs with Defendants' assessment, as Plaintiff has presented nothing other than speculation to suggest these Roundtable reviews were conducted because of the size of her claim or for some nefarious purpose.  Instead, they appear only as Defendants describe them — a brief overview of the issues at hand with recommended next steps for contacting attending physicians for additional information or clarification.

### d.    Unum Properly Relied on the Records Submitted

Further, while Plaintiff asserts that Unum erred by failing to review all of Plaintiff's neuropsychological "raw data," Plaintiff fails to present law from this Circuit to support this contention, nor has the Court identified such law. Defendants, in opposition, contend that "nothing … requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case." *Roganti* v. *Metro. Life Ins. Co.*, 786 F.3d 201, 213 (2d Cir. 2015) (internal citation and alteration omitted).  Absent any legal ground on which Unum was obligated to seek out the raw data underlying Plaintiff's attending physicians' opinions — particularly because this data was submitted neither by those physicians nor by Plaintiff, who bears the burden of establishing disability — the Court will not find that Unum acted arbitrarily and capriciously in denying Plaintiff's claim without obtaining that information.

And, while Plaintiff claims that Unum should be faulted for failing to conduct "a simple inquiry" to gather "'easily obtainable' information" to clarify an issue (*see* Pl. Br. 13), Defendants rightly point out that that "[g]iven the breadth of the testing that failed to find an etiology, it is impossible to imagine what 'easily obtainable' information existed, that [P]laintiff's own lawyers did not submit, and that would have proved her claim" (Def. Br. 30).  The Court agrees: Plaintiff's short- and long-term disability claim files span over 2,200 pages, and no party disputes that Plaintiff underwent comprehensive testing and examination by her attending physicians.  Moreover, Plaintiff does not

point to any "easily obtainable" information that might have impacted Unum's

decision; absent any specificity, Plaintiff's vague claim in this regard falls short.

Along similar lines, Plaintiff also faults Unum's failure to obtain an

independent medical examination ("IME") for Plaintiff prior to denying her

claim.  (Pl. 15-16).  Plaintiff relies on the Maine Bureau of Insurance's 2004

investigative report of Unum, which states that "[w]here there is conflicting

medical evidence or conflicting medical opinions with respect to a claimant's

eligibility for benefits, [Unum has] the ability to invoke the policy provision and

obtain an IME, and should do so."  (Pl. Br. 15 (citing Pl. Ex. 2 at 6)).  Plaintiff

further cites *Strope* v. *Unum Provident Corp.*, No. 06 Civ. 628C (SR), 2010 WL

1257917, at *7 (W.D.N.Y. Mar. 25, 2010), in which the district court criticized

Unum for having "flatly rejected the opinion of plaintiff's treating physician, yet

never request[ing] an independent medical examination [ ] of plaintiff."

However, the Second Circuit has held that "where the ERISA plan

administrator retains the discretion to interpret the terms of its plan, the

administrator may elect not to conduct an IME, particularly where the

claimant's medical evidence on its face fails to establish that she is disabled."

*Hobson*, 574 F.3d at 91.  Further, "requiring the plan administrator to order an

IME, despite the absence of objective evidence supporting the applicant's claim

for benefits, risks casting doubt upon, and inhibiting, 'the commonplace

practice of doctors arriving at professional opinions after reviewing medical

files,' which reduces the 'financial burden of conducting repetitive tests and

examinations.'"  *Id.* (citing *Davis* v. *Unum Life Ins. Co. of Am.*, 444 F.3d 569,

577 (7th Cir. 2006)).  Here, a number of claims reviewers delved into Plaintiff's

medical records and determined that they did not support her claim for an

organically- or physically-based cognitive condition that rendered her

completely disabled from her job.  Because the Court upholds as reasonable

Unum's finding that Plaintiff failed to present objective evidence, the Court also

finds that Unum's failure to seek an IME was not arbitrary and capricious.

> ### e.     Unum's Determination on Appeal Was Not Arbitrary and Capricious

On appeal from Unum's initial determination, Plaintiff relied heavily on

the additional submission of Dr. Crago, pressing her claim that her cognitive

dysfunction was of physical etiology — namely, exposure to toxic mold.  (*See

supra* at 47-49).  Unum did not construe this as additional evidence supporting

Plaintiff's claim, though; as Dr. Thurber determined, Dr. Crago's claims were

unsubstantiated by clinical evidence, and the research cited was of dubious

validity.  Again, the Court finds that Unum did not abuse its discretion in

failing to award Plaintiff long-term benefits on the basis of Dr. Crago's report.

The Court notes that while Dr. Crago provided a number of statements

correlating Plaintiff's symptoms to his own research regarding victims of toxic

mold, he did not demonstrate causation in her case.  Indeed, Dr. Crago

appears to this Court to be the proverbial "man with a hammer,"[24] particularly

---

[24]     *See* Abraham Maslow, THE PSYCHOLOGY OF SCIENCE: A RENAISSANCE 15-16 (1966) ("I
suppose it is tempting, if the only tool you have is a hammer, to treat everything as if it
were a nail.").

in his efforts to harmonize dissonant opinions from Plaintiff's evaluating medical professionals under the banner of toxic mold exposure.

Also, while the Court will not venture to assess Dr. Thurber's critiques of Dr. Crago's research methodology, given its lack of expertise in this area, it does find significant Dr. Thurber's notes that (i) Plaintiff's record revealed "no history of typical respiratory symptoms," like those suffered by Plaintiff's daughter, and (ii) her treating physicians, even when informed that she believed mold could be a cause of her symptoms, declined to consider this as a possible etiology of her disability.  Moreover, as Unum notes, Dr. Crago's research referenced serologic testing to identify toxic mold exposure, yet Dr. Crago did not undertake to perform this testing on Plaintiff, and none of Plaintiff's multitude of tests from her other physicians demonstrated any noted serologic abnormalities potentially attributable to mold.  Dr. Crago did not indicate that testing would be *unable* to demonstrate Plaintiff's exposure for any reason, and the mere reliance on Plaintiff's assertion to draw his conclusions did not obligate Unum to accept his report as objective proof. Accordingly, the Court finds that Unum's denial of Plaintiff's appeal was not arbitrary and capricious, where the additional evidence she submitted failed to prove the cause of her medical issues or to cure the deficiencies noted in Unum's initial review.

**CONCLUSION**

Having considered the full record, including certain additional exhibits submitted by the parties, the Court concludes that Plaintiff failed to meet her burden to show that she had an organically- or physically-based disability under Unum's Long Term Disability Plan, and that Unum's denial of benefits was not arbitrary and capricious. Accordingly, Plaintiff's motion is DENIED and Defendants' motion is GRANTED. Judgment will be entered in favor of Defendants.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

   SO ORDERED.

Dated:  September 29, 2016
    New York, New York

              _____
               KATHERINE POLK FAILLA
              United States District Judge